235 Minn. 192 (1951)
IN RE ADOPTION OF RITA KAY ANDERSON.
ROBERT T. NELSON AND ANOTHER
v.
WALTER J. GIBSON AND ANOTHER.[1]
No. 35,410.
Supreme Court of Minnesota.
November 30, 1951.
*194 L.J. Lauerman and R.G. Johnson, for appellants.
Bang & Nierengarten, for respondents.
MATSON, JUSTICE.
Appeal by natural parents from a judgment decreeing the adoption of their minor child born out of wedlock.
October 3, 1948, Evelyn Anderson, unmarried and 17 years old, gave birth to a female child, Rita Kay Anderson, whose subsequent adoption by respondents is now under attack. On November 5, 1948, the mother executed and delivered to the Kandiyohi county welfare board a written waiver which, after reciting that no relatives were able to give the child proper care and support, provided that the mother 
"waives any further notice concerning any dependency hearing regarding her child, Rita Kay Anderson and also gives her consent to have Rita Kay Anderson committed to the guardianship of the Lutheran Welfare Society so that the said Rita Kay Anderson may receive proper care and training." (Italics supplied.)
On November 29, 1948, the child was taken by a county welfare worker to the Lutheran Welfare Society (hereinafter called the Society) in Minneapolis. On March 18, 1949, dependency proceedings were commenced when Donald E. Ehmke, executive secretary of the local welfare board, filed with the Kandiyohi county probate court, sitting as a juvenile court, a petition which, after alleging the dependency of the child and giving the identity of the mother but not the father, requested that permanent placement plans be *195 made for the child and that she be committed to the guardianship of the Society. Upon this petition, the court on March 21, 1949, after finding that the child was not present at the hearing, that the mother had executed a waiver of appearance and a consent to the child's commitment, and that the father was unknown, ordered the child committed to the custody, control, and guardianship of the Lutheran Welfare Society. Only eight days later (March 29, 1949) the Society placed the child for adoption in the home of respondents.
It is admitted that on November 24, 1948, or four days before the child had been turned over to the Society and nearly four months before the child had been finally committed to its guardianship, Walter J. Gibson, having heard of the child's birth, appeared at the mother's home and there admitted that he was the father. All of nine months later, on September 2, 1949, the mother and father were married. About five months thereafter the mother and father, who are now the appellants herein, consulted their attorney, who on February 8, 1950, wrote a letter to the Society which reads in part as follows:
"Walter Gibson says that he has never consented to the placing of this child for adoption. Evelyn Anderson Gibson, the mother, said that she signed a paper which she understood was to give her consent to the adoption of the child at the time she was 17 years of age. It is the desire of this young couple to secure the custody of their child." (Italics supplied.)
The Society's answering letter of February 9, 1950, after stating that the child had, about ten months earlier, been placed with foster parents for adoption, stated:
"* * * According to all normal planning we would expect to issue consent to legal adoption of the child perhaps sometime in April '50." (Italics supplied.)
By letter of February 14, 1950, appellants' attorney requested that the matter of adoption be held in abeyance until he could consult further with his clients. On February 24, 1950, the natural parents *196 gave written notice that they revoked and withdrew any consent theretofore given to the adoption of their child. On February 28, 1950, the appellant husband, for the first time, acknowledged in writing that he was the child's father.
Pursuant to the foster parents' (respondents herein) petition for adoption, accompanied by the consent of the Lutheran Welfare Society as guardian and the favorable recommendation of the state director of social welfare, the district court of Mower county, on March 6, 1950, adjudged the child to be adopted by respondents. Subsequently on March 16, 1950, pursuant to appellants' petition of March 7, 1950, the juvenile court of Kandiyohi county terminated the guardianship of the Lutheran Welfare Society.
We are concerned with the following issues:
(1) Did the unwed mother in fact give her consent to the placement of her child for adoption?
(2) Was she, not being of age, capable of giving such consent?
(3) In illegitimacy cases, is the consent of the mother alone, without that of the biological father, sufficient for a valid committal?
(4) After the mother's consent has once been given, may it later be revoked or withdrawn?
(5) After the child has once been committed, is the consent of the guardian alone sufficient for a valid adoption?
(6) May a guardian's consent to adoption be nullified by a subsequent vacation of the order appointing him as guardian?
(7) In the absence of the appointment of a guardian ad litem, may a minor child be committed to the guardianship of a placement society for adoption without a violation of due process?
(8) In illegitimacy cases, pursuant to M.S.A. 260.07, must the petition for the committal of a dependent child name the biological father when paternity has not been acknowledged in writing or otherwise established?
The mother signed a written instrument whereby she not only waived notice of any dependency hearings, but also gave her consent to the committal of her child to the guardianship of a placement *197 agency. Instruments of this kind ought to be worded in language so simple and direct as to inform the parent by specific words, and not by mere inference, that the guardianship to which he or she is consenting comprehends the placement of the child for adoption. These instruments ought to convey a clear and unmistakable meaning not only to the lawyer and the trained social worker, but also to the layman who is not familiar with our adoption statutes. In the instant case, however, although we have a conflict of testimony, the evidence as a whole  which it is unnecessary to review in detail  sustains the juvenile court's finding that the mother signed the consent with the knowledge and intent that her child was to be placed for adoption. In fact, her attorney's letter of February 8, 1950, states that the mother signed a paper which she understood was to give her consent to the adoption.
1-2. As a preliminary to a consideration of the questions of law, we must bear in mind that adoption was unknown at common law and is governed entirely by statute. The power to decree an adoption being purely statutory, the statute is the measure of the court's authority. Adoption statutes, however, are to be liberally construed to accomplish their purpose, and there need not be more than a substantial compliance with their requirements to sustain the validity of the proceeding. In re Adoption of Jaren, 223 Minn. 561, 27 N.W. (2d) 656; In re Adoption of Reichel, 148 Minn. 433, 182 N.W. 517, 16 A.L.R. 1016; Spencer v. Franks, 173 Md. 73, 195 A. 306, 114 A.L.R. 263.
3. Was the mother, who had not reached her majority, being only 17 years old, legally capable of consenting to the committal of her child to the guardianship of a placement association?[2] Such guardianship committal was nothing more than a preliminary step to the child's future adoption. The mother's legal capacity is therefore to be determined by the provisions of § 259.03, as amended by L. 1947, c. 400, § 1 (we are not here concerned with said statute as *198 further amended by L. 1949, c. 400, § 1, or with the repeal of this section by L. 1951, c. 508). The statute as then worded provided for the consent of the unwed mother without any limitation upon the giving of that consent by reason of her minority. In the same section it is specifically provided that no child over the age of 14 years shall be adopted without his consent. In other words, the legislature was not unmindful of age qualifications, but chose to make none as to the illegitimate mother. The age of legal capacity is wholly a matter of legislative regulation, and the disabilities of infancy may be removed for certain purposes at an earlier age than for others. State ex rel. White v. Patterson, 188 Minn. 492, 249 N.W. 187; see, In re Trust Under Will of Davidson, 223 Minn. 268, 26 N.W. (2d) 223, 170 A.L.R. 215. It follows that the mother, though a minor  as the law then existed  had the capacity to consent to the adoption of her child. See, 1 Am. Jur., Adoption of Children, § 37.
4. Where illegitimacy is involved, § 259.03, as amended by L. 1947, c. 400, § 1,[3] specifically requires nothing more than the consent of the mother as a prerequisite for the valid committal of a child  who is not over 14 years old  to the guardianship of a child-placing agency for placement for adoption. No mention is made of the biological father or any other person. The expression of one thing is the exclusion of the other.[4] It follows that the consent of the mother alone was sufficient. See, 1 Am. Jur., Adoption of Children, § 37.
5-6. Where the natural mother in an illegitimacy case has duly consented to the committal of her child to the guardianship of the state director of social welfare or to that of a child-placing agency for placement for adoption,[5] may she withdraw or revoke such consent after the committal order has been made? A consideration *199 of the provisions of § 260.06 indicates that the legislature, by direct expression of finality, clearly intended the committal order to be a final adjudication of parental rights  subject only to the right of appeal as from any other final order  so as to terminate permanently such parental rights and place them beyond recall by any attempted revocation or withdrawal of consent. Where the legislature specifically provides that an order shall be final and appealable, a finality of adjudication is intended. The same interpretation of the statute was made by the attorney general in an official opinion given 25 years ago.[6] Rulings of the attorney general, when they have been acted upon and have gone unchallenged for many years, are of much persuasive weight in statutory construction. Similar finality of adjudication of parental rights was found in respect to a committal statute by the supreme court of Michigan in Gonzales v. Toma, 330 Mich. 35, 46 N.W. (2d) 453.[7]
In illegitimacy cases, it follows as a further result of the adjudication of parental rights by committal pursuant to §§ 260.06, 260.07, 260.08, and 260.11 that the finality thereof, in the absence of statutory exceptions to the contrary, is not impaired by a subsequent intermarriage of the natural parties, or by the subsequent admission in writing by the biological father of his paternity, whereby such parents or either of them become possessed of any power to revoke the mother's prior consent or to impair the exclusive right of consent vested in the guardian, or whereby they, pursuant to § 259.05 (subsequently repealed by L. 1951, c. 508), become entitled to notice of subsequent adoption proceedings. Section 259.05 requires the giving of notice of subsequent adoption proceedings to the father of an illegitimate child who has acknowledged his paternity in writing only if there be no duly appointed guardian. Where, as here, a child has once been committed to a placement society for adoption, the society is the duly appointed guardian. Although *200 a committal order is a final adjudication of parental rights, it does not follow that upon proper petition the court, in the exercise of a cautious and sound discretion, may not, if proposed adoptive parents have not taken custody of the child and cared for it for such a substantial period of time that bonds of affection in the nature of a vested right have been forged between them and the child, restore the child to the custody of the natural parents when such restoration will promote the child's paramount welfare. In fact, § 260.11 specifically authorizes such restoration in the following words:
"* * * The parent or attorney for any such child committed, may petition the juvenile court which made the commitment for the discharge of the child."
Parents who faithfully discharge their parental obligations with assiduity and to the full extent of their means and abilities are entitled to the custody of their children. Parental rights, however, are not absolute and are not to be unduly exalted and enforced to the detriment of the child's welfare and happiness. The right of parentage is not an absolute right of property, but is in the nature of a trust reposed in them, and is subject to their correlative duty to protect and care for the child. The law secures their parental right only so long as they shall promptly recognize and discharge their corresponding obligations. As the child owes allegiance to the government of the country of its birth, so it is entitled to the protection of that government, which, as parens patriae, must consult its welfare, comfort, and interests in regulating its custody during its minority. Purinton v. Jamrock, 195 Mass. 187, 80 N.E. 802, 18 L.R.A. (N.S.) 926.[8]
7-8. Clearly, where, with the consent of the mother, a child born out of wedlock has been committed to the guardianship of a child-placing agency for adoption, the consent of the guardian alone without *201 any further consent of either natural parent, and without further notice to either of them, is sufficient as a basis for a subsequent valid adoption. Section 259.03, as amended by L. 1947, c. 400, § 1, not only provides that the consent of a parent may be dispensed with where parental custody has been lost by order of a juvenile court, but also specifically gives the right of consent to the guardianship agency and requires no other person's consent except that of the child, and then only if he or she be over 14 years old. Furthermore, the subsequent action of the probate court terminating the guardianship was without effect. If jurisdiction existed when the guardian was appointed, it follows that the guardian's consent to the adoption of a child is not nullified by the subsequent vacation and annulment by the probate court of the order appointing the guardian and the letters of guardianship. The vacation or revocation by a probate court of its letters, orders, and decrees issued or made with jurisdiction over the subject matter, does not render them an utter nullity and void ab initio, but ineffective only from the time of the vacation or revocation. In re Adoption of Pratt, 219 Minn. 414, 18 N.W. (2d) 147.
9. Appellant contends, however, under the authority of In re Wretlind, 225 Minn. 554, 32 N.W. (2d) 161 (wherein the mother appeared as an adversary), that, because the probate court failed to appoint a guardian ad litem for the child, it was, under the due process clauses of the federal and state constitutions, without jurisdiction to make the order committing the child to the guardianship of the society for placement for future adoption. The Wretlind case is not applicable, in that it was an adversary proceeding designed to effect a change of status through an adjudication of mental defectiveness as a basis for the child's committal to a state school for the feeble-minded. An original proceeding to adjudicate a person a mental defective, and thus to deprive him of his normal legal status and rights, involves fundamental considerations which do not pertain to an individual whose status of legal incapacity already exists by virtue of infancy or by virtue of a prior adjudication. See, Jasperson v. Jacobson, 224 Minn. 76, 88, 27 N.W. (2d) *202 788, 795; 32 Minn. L. Rev. 637-639. In one case we have a proceeding to deprive a person of his normal status, whereas in the other the proceeding is not to change or terminate his established status, but to protect him with respect to a status of legal incapacity which already exists. In the Wretlind case, we did nothing more than adhere to the fundamental principle that a court, pursuant to the due process clauses of the state and federal constitutions, has no jurisdiction to adjudicate a valid change of a person's legal status unless a method of notification is employed which will reasonably give him knowledge of the attempted exercise of jurisdiction and an opportunity to be heard. Although infancy was not the basis therein for the committal, an infant was involved, and due process required the appointment of a guardian ad litem. See, Restatement, Judgments, § 33, comments a and b; Id. Conflict of Laws, § 109; Annotation, 23 A.L.R. 594; Jasperson v. Jacobson, 224 Minn. 76, 82-83, 27 N.W. (2d) 788, 792-793. In the instant case, however, we have no attempt to change an existing legal status, but purely a proceeding designed for the protection of a child who, in the eyes of the law, is already suffering from the disability of infancy. By its very nature, a proceeding for the committal of the person of a dependent or delinquent child to the custody of a statutory agency for placement for adoption is simply a protective measure designed to provide the child with guardianship representation and protection as a preliminary step to the finding of suitable foster parents who will give it parental care and protection. Its purpose is to secure for the infant the rights and advantages of a normal childhood. Where the condition or status of legal incapacity is conceded and is not in issue, as normally in the case of incapacity based on minority, notice to the minor himself in proceedings for the appointment of a guardian is not a jurisdictional prerequisite in a constitutional sense, but only as required by statute.[9] The constitutional provisions for due process are not called into play by *203 protective proceedings which involve no impairment of status or other substantial right. For the protection of the public, as well as for the protection of dependent and delinquent infants, the state, as parens patriae, possesses this protective power and exercises it in the manner prescribed by statute. In re Adoption of Pratt, 219 Minn. 414, 18 N.W. (2d) 147.
10. The initial committal proceeding was commenced by the filing of a petition pursuant to § 260.07, which provides, among other things, that the petition shall set forth the name and residence of each parent, if known. Although the petition gave the name and address of the natural mother, no mention was made of the biological father. It is admitted that the mother had given the executive secretary of the local welfare board the name of the alleged father, with the statement that she wished no legal action to be taken against him. When the court inquired if the father was known, the secretary answered that paternity had not yet been established. Did the petition as drawn comply with § 260.07 so as to confer jurisdiction upon the court? What did the legislature intend by the requirement that the petition shall set forth the identity of each parent, if known? Paternity in illegitimacy cases is frequently a disputed matter, and the designation by the mother of an individual as the father is not of itself decisive. It is not reasonable to assume that the legislature intended to require a third-party petitioner to state that he knew or believed a certain individual to be the father with no other basis therefor than the paternity accusation of the mother. That the legislature was aware of the practical difficulties in illegitimacy cases of determining paternity with reasonable certainty and dispatch is indicated by the provision of § 259.03 (subsequently repealed by L. 1951, c. 508) that the consent of the mother alone shall be sufficient for adoption. In ascertaining legislative intent, it is elementary that consideration may also be given to the occasion and necessity for the statute and the object to be attained. § 645.16(1,4). The rescue of dependent, neglected, or delinquent children, as well as reasonable promptness in the safeguarding of their welfare, demands prompt action. This need for prompt action *204 is recognized by § 260.08, which authorizes the juvenile court to proceed in a summary manner. In order to fulfill the legislative purpose of securing prompt protective action for the welfare of dependent, neglected, or delinquent children, it follows that § 260.07, in illegitimacy cases, is to be construed as requiring the petition to set forth the name and residence of the biological father only where his identity is actually known by reason of his written acknowledgment or where his paternity has otherwise been legally established. See, Gibson, Appellant, 154 Mass. 378, 28 N.E. 296. In the instant case, the petition was adequate to confer jurisdiction upon the court. We also find no evidence of the commission of any fraud upon the court.
The judgment and decree of the district court is affirmed.
Affirmed.
NOTES
[1] Reported in 50 N.W. (2d) 278.
[2] As to accredited placement associations and agencies, see M.S.A. 259.03, as amended by L. 1947, c. 400, § 1, and L. 1949, c. 400, § 1, and § 260.11, and as further repealed and supplanted by L. 1951, c. 508.
[3] Subsequently amended by L. 1949, c. 400, § 1. It should be noted that M.S.A. 259.01 to 259.09 was repealed by L. 1951, c. 508, and supplanted by sections coded as §§ 259.21 to 259.32.
[4] Those who find the English language inadequate may prefer Expressio unius est exclusio alterius.
[5] See, M.S.A. 259.03, as amended, and § 260.11.
[6] See, Opinion Attorney General, No. 268-F, January 13, 1926.
[7] In this case, the Michigan court distinguishes its prior decision of In re White, 300 Mich. 378, 1 N.W. (2d) 579, 138 A.L.R. 1034; see, Wyness v. Crowley, 292 Mass. 461, 198 N.E. 758; Lee v. Thomas, 297 Ky. 858, 181 S.W. (2d) 457.
[8] This court has not overlooked the majority opinion in Lacher v. Venus, 177 Wis. 558, 188 N.W. 613, 24 A.L.R. 403. See, Annotation, 24 A.L.R. 428. The Lacher opinion is contrary to the weight of authority and wholly overlooks the paramount welfare of the child. See, Annotations, 24 A.L.R. 428, 76 A.L.R. 1077, 1083.
[9] Kurtz v. St. Paul & Duluth R. Co. 48 Minn. 339, 51 N.W. 221; Whittelsey v. Conniff, 266 Mo. 567, 182 S.W. 161, 1 A.L.R. 913, with Annotation at 919; 25 Am. Jur., Guardian and Ward, § 37. See, Gibson, Appellant, 154 Mass. 378, 28 N.E. 296.