In the Matter of G. K. D., a Minor.
N. D. L. (Petitioner), Appellant,

v.

**FAMILY & CHILDREN'S SERVICE OF GREATER ST. LOUIS, Respondent.**

No. 30236.

St. Louis Court of Appeals.

Missouri.

Feb. 16, 1960.

Karl F. Lang, St. Louis., for appellant.

Fred A. Eppenberger, John R. Barsanti, Jr., St. Louis, for respondents.

Edward L. Dowd, St. Louis, for prospective adoptive parents and amicus curiae.

MARSHALL CRAIG, Special Judge.

The appellant was the petitioner in the trial court. She was the natural mother of G. K. D. In her petition she sought to have the court set aside its order transferring the custody of G. K. D. to the Family & Children's Service of Greater St. Louis, to revoke her consent to adoption, and asked that she be granted custody of said child. This petition was filed on May 8, 1958. The order of the court authorizing the transfer of the child to the Family & Children's Service of Greater St. Louis was dated December 17, 1957. The Family & Children's Service of Greater St. Louis is the respondent.

The record discloses that appellant's first marriage was to D. L. B. from Ellis, Missouri, on or about May 18, 1951. He divorced her on or about May 18, 1955. After that divorce, her first child (not the child in controversy here) was born to her in September, 1955, at Bonne Terre, Missouri. Appellant was not certain that D. L. B. was the child's father. She told the Juvenile Court probation officer and the social worker that her first child was born out of wedlock. This child was left with appellant's sister until she got an apartment and a baby sitter, and then later she went to live with her stepmother at River Mines, and then she moved to Elvins, Missouri. The child was left during the day with a baby sitter. Then in June of 1955, she moved to St. Louis, Missouri, and the child was taken

care of by the lady upstairs. This arrangement continued until the spring of 1957.

About January, 1956, appellant began going socially with A. G. L., they having known each other ten or twelve years. After about fifteen months of keeping company with him, she became pregnant. When she became aware of her condition in February, 1957, she and A. G. L. decided to get married, and obtained a marriage license in Farmington, Missouri. Before a marriage was performed, A. G. L. disappeared, and although she tried to reach him by telephone and letter at his home in Flat River, Missouri, she received no response from him. She continued to work in St. Louis until June, 1957. On July 15, 1957, when she was five months pregnant and no longer able to work, she contacted the Family & Children's Service of Greater St. Louis for help. This agency, respondent herein, is a voluntary, non-sectarian, non-profit, private agency supported by the United Fund. Its primary function is to try to keep families together, and its services include family counseling, assisting unmarried mothers, placement and supervision of children in selected boarding homes and placement of children for adoption, it having been duly licensed by the State Department of Health and Welfare of the State of Missouri for this purpose.

When the appellant came to respondent and explained her condition, the agency made immediate arrangements for her to enter Booth Memorial Women's Hospital. The baby was born on October 29, 1957, and she gave him her first husband's name. She refused to see the baby. The child was placed in a foster home. On December 17, 1957, the custody of the child was transferred by the Juvenile Court of the City of St. Louis to the Family & Children's Service of Greater St. Louis, and on February 20, 1958 the child was placed in the home of Mr. and Mrs. A.

On March 25, 1958, appellant, through her attorney, advised the respondent that she desired to have the child returned to her. She had heard from A. G. L. in February, 1958, and they agreed to get married. She married him on April 30, 1958. On May 9, 1958, she filed her petition to set aside transfer of custody and to revoke consent to adoption. A. G. L. did not join her in her petition, even though he contends that he is the father of G. K. D.

Appellant's petition was denied by the trial court. A closer examination of the facts discloses that appellant's parents are both deceased and that she was 25 years of age in July, 1958.

Appellant testified that she had gone to high school with A. G. L. He testified that in March, 1957, he went to Kansas for two weeks, then came back to live with his mother in Flat River; that he knew appellant was pregnant when he left for Kansas; that he gave her no financial support and had no contact with her from March, 1957, until February, 1958; that he was sort of between two fires, his religion and his family were pressuring him.

When further reference to the child in controversy, the representative of the respondent had at least twelve meetings with appellant between July 22, 1957 and December 16, 1957. A representative of the agency testified that she had many consultations with appellant; that on the first day when she drove her back home, appellant stated that "perhaps it might be better to give the baby up" because she had no adequate financial resources and no husband to support the child; that the representative told her to reconsider it very carefully and told her that the agency would no nothing against her wishes in making plans, and that at the next meeting she was told that the agency would go along with the plans the appellant was making at the time; but whenever she decided to change her mind she should not refuse to discuss things with the agency "because so many girls do change their minds later on." After the baby was born on October 29, 1957, the representative of the agency called on the appellant on October 31, 1957. Appellant de-

clined to see the baby, and signed papers agreeing to foster home placement for the child. On November 13, 1957, the child was taken to the agency's pediatrician and then placed in a foster home. Prior to that time appellant had left the hospital, leaving the baby there. The agency had difficulty contacting appellant thereafter.

On December 16, 1957, appellant appeared at the St. Louis Juvenile Court and had an interview with a deputy probation officer. The officer talked privately with the appellant and among other things asked her if the adoption had been explained to her, and was informed that it had been. There was no showing of any pressure being put on appellant. She then signed the petition for transfer of custody and consent for future adoption. The transfer of custody hearing was held on December 17, 1957, and an order at that time made transferring the child to the Family & Children's Service of Greater St. Louis.

The child was placed in the home of Mr. and Mrs. A. for adoption, on February 20, 1958, and had, according to the testimony, made an excellent adjustment with the adoptive parents and was very much at home with them. The adoptive parents were shocked when faced with the possibility of having the child taken from them. They had been married in February, 1946, and were childless. Mr. A. had been employed by the Carter Carburetor Co. for seventeen years, then became Chief of Police of the City of Dellwood. Both Mr. and Mrs. A. testified as to their future plans for the child and their love for him.

Appellant had made no effort to see the child prior to consulting her attorney in March, 1958.

Appellant's petition to set aside the transfer of custody and to revoke consent to adoption was filed on May 9, 1958.

The appellant bases her appeal on the ground that the trial court erred in (1) retaining jurisdiction when in fact the Juvenile Court of the City of St. Louis did not have jurisdiction over the matter under the statutes of the State of Missouri, (2) the exercise of its judicial discretion in refusing to allow the petitioner (appellant) to revoke her consent to adoption, (3) finding that the best interest of G. K. D. would be served by his remaining in the custody of the proposed adopting parents, (4) not permitting the appellant to revoke her consent because the evidence disclosed that appellant and A. G. L. were later married and A. G. L. acknowledged that he was the father of G. K. D., thus making the child their legitimate child, and (5) not permitting the appellant to revoke her consent because the evidence disclosed that the child was legitimized by the marriage, and the consent of the father thus became necessary for the legal transfer of custody and later adoption.

This is not an appeal from an adoption as such. The action herein originated as a proceeding to set aside an order transferring the minor child, G. K. D., to the Family & Children's Service of Greater St. Louis and for a further order revoking the prior consent of the mother-appellant. We will first look at the question of jurisdiction raised by appellant. There is no merit to her contention. She filed her proceedings herein to set aside the transfer of custody and to revoke her consent in (1) the court where she had originally filed her transfer of custody petition and (2) the court where the transfer was made and where jurisdiction had been fixed. The trial court was asked by the appellant to set aside an order made by the same trial court. The adoption proceeding may present another jurisdictional question which is not before us. The question of jurisdiction is ruled adversely to the appellant.

We come now to the important questions as to whether the trial court erred in the exercise of its judicial discretion in refusing to set aside its order transferring the custody of G. K. D. to the Family & Children's Service of Greater St. Louis and in refusing to revoke the appellant's consent

to adoption. The exercise of sound discretion of the trial court, the destruction of the child-parent relationship, and the welfare of the child all now become factors to be considered.

■■ Our adoption laws are found in Chapter 453 RSMo 1949, V.A.M.S. Adoption is purely a creature of statute and repugnant to the common law. Adoption of McKinzie, Mo.App., 275 S.W.2d 365. Our courts strictly construe the adoption statutes where the situation involves the destruction of the parent-child relationship. Adoption of McKinzie, supra; Hyman v. Stanley, Mo.App., 257 S.W.2d 388; Rumans v. Lighthizer, 363 Mo. 125, 249 S.W.2d 397; In re Adams, Mo.App., 248 S.W.2d 63; Robertson v. Cornett, 359 Mo. 1156, 225 S.W.2d 780; In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686; Rochford v. Bailey, 322 Mo. 1155, 17 S.W.2d 941.

The court in the case of In re Perkins, supra, 117 S.W.2d loc. cit. 691, after stating that the statute is to be liberally construed with a view to promoting the best interest of the child, went on to say:

"* * * but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine. * * * Consequently, it is uniformly held as a simple matter of natural justice that adoption statutes are to be strictly construed in favor of the rights of natural parents, and that when controversy arises between natural parents and those who seek to destroy their parental status, every reasonable intendment is to be made in favor of the formers' claims. * * *"

The appellant executed "Consent by Mother to Transfer of Custody and Waiver of a Necessity of Consent to Future Adoption." This was executed on December 16, 1957, the same day she also executed a "Petition by Mother for Transfer of Custody of Her Minor Child to Family & Children's Service of Greater St. Louis." In this petition she stated that she was twenty-four years of age; that the child was born out of wedlock on the 29th day of October, 1957; that she had sole custody and right of custody of the child, and prayed the court to enter an order transferring custody of her child to the Family & Children's Service of Greater St. Louis. Consent to the transfer was entered by the agency. The report of the probation officer was filed. A hearing was had by the court on the petition to transfer custody, and on December 17, 1957, the court entered its order transferring custody of the child to the Family & Children's Service of Greater St. Louis. Appellant's petition to set aside the transfer of custody order and to revoke the consent to adoption was filed on May 9, 1958.

The consent of the mother to the transfer was in accordance with the provisions of Sections 453.030, 453.050, subsection 1, and 453.040, subsection 3 RSMo 1949, V.A.M.S. The proceedings in the court were in accordance with the provisions of the statutes concerning transfer of custody.

Section 453.050, subsection 2 RSMo 1949, V.A.M.S. provides:

"* * * and any such waiver or consent shall be irrevocable without leave of the court having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties."

By this section, the question of revocation becomes the problem of the court and a determination of the question of revocation raises the point as to whether the trial court acted within its judicial discretion in entering its order, as in this case, refusing to revoke the consent.

The Missouri statute relative to revocation and consent provides no rule for the guidance of the court in exercising its discretion. The result is well stated in the

case of Adoption of McKinzie, supra, 275 S.W.2d loc. cit. 371:

"The cases which hold that revocation may be permitted at the discretion of the court and for good cause shown we think are no more than judicial expressions of what is now provided by the Missouri statute, which recognizes the right of revocation but provides there can be none except by leave of court after a hearing and notice. The section itself does not furnish the juvenile court any rule or guide for the exercise of its discretion (an examination of the cases which hold in favor of limiting the right of revocation will indicate the difficulty of fixing any exact rule). It is obvious that in Missouri the right of revocation is no longer dependent upon the arbitrary whim or caprice of the parent. Otherwise there would have been no reason or necessity for including the provision. The fact that notice and hearing are required indicates that revocation may be denied for certain causes or reasons. The question we attempt to answer is, for what causes and for what reasons?

"Construing this particular portion of the act with and in the light of the other provisions, as we should, in re McAvoy's Adoption, 237 Mo.App. 1099, 173 S.W.2d 108, and calling upon the aid furnished by decisions in other states, it is our conclusion that the provision for revocation only by leave of court does not destroy in toto the right of the mother to call back unto herself the sacred relationship of parent and child. But she may not arbitrarily undo and destroy that which she herself has permitted to be set in motion. It must be remembered that the ultimate purpose of adoption statutes is the welfare of the child, and the wishes and wants of the natural parents and also of the proposed adoptive parents can be considered as only secondary to this ultimate purpose."

In the McKinzie case, supra, a petition for adoption was filed and the consent of the mother was given in writing. A preliminary hearing was had to determine whether a revocation of consent by the mother should be permitted. The evidence showed that the mother was eighteen years of age when the child was born; that she had been previously married; that she signed the consent for adoption; that she later married a man named Burke and then changed her mind as to her consent and sought to revoke same. The trial court ordered the adoption petition dismissed and the infant returned to the natural mother. The appellate court affirmed the trial court, stating that no preliminary order of transfer had been duly made, there was no evidence to show the development of affection, or any material change of position which would be harmful either to the petitioners or the child in the event the consent was revoked. The language in that case is important as a guide to us in the case at bar. The court said, 275 S.W.2d loc. cit. 369:

"The old rule, and we think still the majority rule, has been that the consent of the parent as required by the statute is a *continuing* consent which must be in force and effect at the time the adoption decree is entered. This being so, the natural parent, in the exercise of her parental right, could revoke the consent at any time prior to judgment and thus deprive the court of jurisdiction to proceed. 138 A.L.R., p. 1038, 2 C.J.S. Adoption of Children § 21(4), Withdrawal, p. 386.

"Prior to the 1947 act there can be no doubt that the law of Missouri was with the majority. It was said in Re Application of Graham, 1946, 239 Mo. App. 1036, 199 S.W.2d 68, at loc. cit. 73, 'It is the clear intent of the Adoption Code that the consent in writing of the parents or other guardian be had at the time of and as a requisite to a decree of adoption, unless one of the specified exceptions to that requirement exists.

Rochford v. Bailey, 322 Mo. 1155, 1161, 17 S.W.2d 941.

" 'It cannot be denied that appellants in this case did on July 6, 1945, give their consent in writing to the adoption of the children. They also signed relinquishments of the children a few days previously and delivered over the children and their birth certificates to the respondents. However, they formally withdrew their consent before trial and in writing protested and objected to the petition and prayed for the custody of their children. Under the greater weight of authority they had a right to withdraw their consent before the judgment, and, in effect, they did so. 2 C.J.S. Adoption of Children § 21(4), p. 386; State ex rel. Platzer v. Beardsley, 149 Minn. 435, 183 N.W. 956; In re Nelms, 153 Wash. 242, 279 P. 748.'

"However, in recent years there has been a growing tendency to limit the right of revocation of consent by the natural parent, as held in Re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644. The annotation at 156 A.L.R., p. 1011, expresses this view as follows:

" '* * * it must now be said, in view of the later cases (arising, it will be noted, in jurisdictions other than those represented in the earlier annotation), that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a "vested right," have been forged between them and the child.' "

With further important and well-stated language, the court in the McKinzie case, supra, 275 S.W.2d loc. cit. 373, continued:

"We think also that the welfare of the child should be considered on such inquiry, but only in and limited to the question as to whether or not it will be materially affected by the change of condition wrought by the discontinuance of the existing situation. All these things, and no doubt more which we have failed to mention, might properly be considered by the court and weighed and balanced against each other in determining whether the revocation should be allowed, and each case must be decided on its own circumstances. We do not intend by these expressions that the trial court shall enter into a hearing to determine the ultimate or relative fitness of the parties or the ultimate best interests of the child. These are matters reserved for the final hearing on the adoption petition. It might well be the court would in its discretion determine there did not exist sufficient good cause to permit the withdrawal, and still in the hearing on the main case consider that the natural parent was desirous of reclaiming her child and that under all the circumstances the best interests of such child would be furthered by denying the adoption. But if on the other hand the court should find that the revocation should be allowed, the consent (which is jurisdictional) has been withdrawn and the more quickly the proceedings can be terminated the better it will be for all concerned."

In the case of In re Mayernik, Mo., 292 S.W.2d 562, an appeal was taken from an order denying an application for the revocation of a natural mother's consent to an adoption and for restoration of the custody

of the child to her. The trial court heard the adoption petition and the natural mother's revocation of her consent at the same hearing, and granted the adoption and denied the petition for revocation. With reference to the petition for revocation of her consent, the court stated, loc. cit. 569:

" * * * By clear intendment, this matter was subject to the court's sound discretionary action. Subsection 2, §§ 453.050 and 453.110, supra."

The court then quoted the portion of Subsection 2, Section 453.050 relative to the consent being irrevocable without leave of court, and after discussing the history of consent, stated (loc. cit. 570):

" * * * It has been written, however, that the trend of more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection have been forged between them and the child. See the Annotation, 156 A.L.R. 1011; and In re McKinzie's Adoption, Mo. App., 275 S.W.2d 365. * * * It would seem that our present statute, § 453.050, supra (a part of the 1947 'consent section,' as stated), particularly Subsection 2 thereof, contemplates that a parent's consent to an adoption, freely given and duly executed, may not be arbitrarily withdrawn by the parent, and that the court, whose ward the child is in any custody or adoption proceeding, has the discretionary power and responsibility of determining whether the consent should be revoked

and custody of the child restored to the parent. In re McKinzie's Adoption, supra. And the court's sound discretionary action in this matter, as in other matters pertaining to adoption, should be governed primarily by considerations bearing upon the welfare of the child. State ex rel. Earnest v. Meriwether, Mo.Sup., 270 S.W.2d 20; In re McKinzie's Adoption, supra."

In the Mayernik case, a further contention was that the consent of the mother had been executed under circumstances of such dire necessity that the execution of the instrument was not her voluntary act, and even if voluntary, the trial court erred or abused its discretion in denying the revocation of her consent. After reviewing the facts, the court concluded, 292 S.W.2d loc. cit. 572:

" * * * Our careful survey of the evidence convinces us that Shirley Jean made her decision knowingly, and was prompted by the belief she was acting to the interests of Marjie Lee when she executed the consent to the adoption."

The Supreme Court upheld the trial court, and denied the mother's petition to revoke her consent.

■ In the case at bar, the evidence shows that the appellant, natural mother, had appeared voluntarily at the respondent's office on July 15, 1957; that between that time and the birth of the child on October 29, 1957, and also the signing of the consent on December 16, 1957, she had had sufficient time and opportunity to consider her circumstances and desires; that the evidence fails to disclose any pressure, intimidation, undue influence or false representations on the part of the respondent or any arm of the court; that she signed the consent after being fully advised and informed of her rights, and the consequences of her consent; that she refused to see the child after its birth; and signed papers agreeing to foster home placement for the

child; that she appeared at the St. Louis Juvenile Court on December 16, 1957, and at that time had an interview with a deputy probation officer of the court and then signed the petition for future adoption and transfer of custody; that she thereafter broke her contacts with respondent and took no further interest in the child nor steps to revoke her consent until her attorney wrote the respondent on March 25, 1958. The evidence further shows that after the birth of the child, and after the appellant left the hospital, the agency took the child to a pediatrician and placed him in a foster home. The child stayed in the foster home on a boarding basis until February 20, 1958. By that time, the mother had filed her consent, and the court had entered its order. The child was placed in the home of Mr. and Mrs. A., and made an excellent adjustment there and was very much at home. The adoptive parents both testified as to their love and affection for the child and the return of that love by the child. The good character and adequate financial condition and ability of the adoptive parents was shown. The child had been baptized and the adoptive parents considered and treated him as a son, and had made plans for his future, including his education. Mr. Anthony DeMarinis, a social worker with many years of professional experience and with a knowledge of the factual situation in this matter, testified that to again change the parents of G. K. D. and to uproot him from his present happy home life would be very detrimental to the child and a "very definite reaction would set in."

We think that there are further important matters to consider as shown by the evidence. The natural mother was not an infant, and was not without valuable experience and knowledge to guide her in making her decision with reference to signing the consent. She was twenty-four years of age when the child was born. She had experienced motherhood before. She first became a mother in September, 1955, following a separation from her husband.

Thus she knew the responsibilities and duties of motherhood. She had enjoyed the opportunity of knowing the natural love and affection between mother and child. With all of her background, she could make up her own mind. We do not find that she was in any way coerced, intimidated or unduly influenced to sign the consent. Her actions were all voluntary. We further find that her consent and apparent disregard for the child resulted in the respondent rendering a great service to the child. In addition, the action by the mother permitted the placement of the child for adoption, and the evidence clearly shows development of strong ties of affection on the part of the adoptive parents and the child. Such material changes had taken place that to now disturb them would be harmful both to the child and the adoptive parents. The trial court did not abuse its discretion. The evidence was sufficient for the court to determine that the consent of the mother should not be revoked, and to further determine that the best interests of G. K. D. would be served by his remaining in the custody of the proposed adopting parents.

We, therefore, hold that the Juvenile Division of the Circuit Court of St. Louis, in refusing to set aside its order transferring custody of G. K. D. to the Family & Children's Service of Greater St. Louis, and in denying the revocation of consent of the appellant, was acting in its sound discretion, and that the trial court did not abuse its discretion.

Appellant testified that the father of the child, G. K. D., was A. G. L. After signing of the consent, and the orders of the court, and just prior to the filing of her petition in this action, appellant was lawfully married to A. G. L. The date of the marriage was April 30, 1958. The evidence further shows that A. G. L., under oath, stated that he was the father of the child. By reason of these facts, two questions are presented to the court. First, did the marriage, as shown by the evidence, legitimize the child? Second, what was the legal effect of the marriage relative to the

right of the appellant to revoke her consent?

▮ The first question is resolved by the provisions of section 474.070 RSMo 1949, V. A.M.S., which provide:

"If a man, having by a woman a child or children, afterward inter-marries with her and recognizes the child or children to be his they are thereby legitimated."

By the marriage of appellant and A. G. L. on April 30, 1958, G. K. D. was legitimized.

▮ The second question poses a more difficult question. We do not find any Missouri law or cases that assist us in the decision on that point.

It will be noted that the above quoted statute is a part of the statutes bearing the title "Descent and Distribution." The history of the section indicates that it has always been a portion of the statutes relative to probate of wills, and descent and distribution of property. Its intent apparently is for the benefit of a child, or children, in relation to their rights of inheritance. Lowtrip v. Green, 363 Mo. 619, 252 S.W.2d 524.

As heretofore pointed out, these proceedings are in connection with orders made by the court and the petition of appellant to withdraw her consent. The mother, appellant, waived the necessity of her consent to future adoption, and following that consent, the court of competent jurisdiction placed the child in the respondent's custody. Time for giving that consent is fixed by the statute. There is no provision for revocation of the consent except by order of the court. Since the child was born out of wedlock, the mother's consent was the only one that could be obtained. She was the only parent known to the law.

The cases in other states do not follow any one clear-cut line of reasoning or decision. We think that the cases, holding that in situations having facts similar to the case at bar that the consent of the putative father is not necessary, follow the better reasoning. A recent case very much in point is that of In re Simaner's Petition, 16 Ill.App.2d 48, 147 N.E.2d 419 (Dec. 23, 1957). In this case the mother, Jeanette Lave Simonick, gave birth to an illegitimate child on March 26, 1955. She left the child at an orphanage, and on November 23, 1955, signed a consent for adoption. The child was placed in the home of James and Margaret Simaner for adoption, by the Catholic Home Bureau. On about March 15, 1956, the mother contacted the Catholic Home Bureau and attempted to orally revoke her consent for the adoption of the child. Thereafter, on April 21, 1956, the mother and the putative father, Joseph Simonick, were married. Petition for adoption was filed by the Simaners on June 27, 1956 and on July 27, 1956, the Simonicks were granted a petition to intervene. The father had not signed a consent, and the mother contended that she had signed the consent under great mental distress and emotional tension and disturbance. The Illinois Court of Appeals stated the problem as follows, 147 N.E.2d loc. cit. 421:

"There are two contentions before us: one, that Jeanette Simonick had a right upon the evidence introduced in the hearing to withdraw her consent to the adoption, and the other that the adoption case could not proceed, nor could any decree be entered therein, without the consent of Joseph Simonick, Sr. to the adoption of the child.

"The document termed a consent, signed by Jeanette Lave on November 3, 1955, surrendered the management, control and custody of her child to the Catholic Home Bureau, a licensed child welfare agency. It also provided that she gave the Bureau authority to place him in a home for legal adoption, that she consented to the legal adoption of

the child by such persons as the officers of the Bureau shall deem to be for the best interests of the child, without notice to her and without her consent, and gave the Bureau full authority to enter its appearance and that of its superintendent in any proceeding brought for the legal adoption of the said child. The consent was properly acknowledged."

The court then first held that the mother could not be permitted to withdraw her consent, stating that the fact that the mother was mentally disturbed at the time did not constitute duress. The court stated, 147 N.E.2d loc. cit. 422:

"* * * Her act was deliberate and undoubtedly, as she felt at the time, for the best interests of the child."

The court then discussed the Illinois statute which appears to be very similar to that of Missouri with reference to the question of the child being legitimated by the subsequent marriage, and stated:

"* * * The question which we must determine is whether or not the fact of the subsequent marriage of the putative father with the mother before the filing of the proceedings for adoption and the consequent legitimization of the child gives to the father the right to resist the adoption on the ground that no consent had been given by him.

"The child was born on March 26, 1955 and was left by his mother with St. Vincent's orphanage on October 27, 1955 under and by virtue of an interview with the Catholic Home Bureau. On November 23, 1955 the mother executed an instrument giving the custody of the child to the Catholic Home Bureau and consenting to his adoption. Shortly after the mother formally relinquished custody of the child and consented to his adoption, the child was placed with the present

petitioners who are now seeking to adopt him. The marriage of the parties occurred on April 21, 1956, some six months after the child was given up by the mother. No move was made by the mother until March 15, 1956, when she attempted to orally revoke the consent for adoption of the child and was told by the Catholic Home Bureau authorities that the child could not be returned to her. From that time until June 27, 1956 no action was taken either by the mother or the father with reference to the child. The legislature, by providing in paragraph 3—7 of chapter 4 that the consent to adoption shall be irrevocable unless a court finds that it has been obtained by fraud or duress, made a declaration of public policy. The purpose of the Illinois statute authorizing the adoption of children is to provide homes for children who may be so unfortunate as to have none, and so to promote the interests of society. The practice of adoption is beneficial to the adopted child and likewise tends to serve the best interests of society and the State. 1 I.L.P. Adoption § 2. It is the public policy of this State that the interest and welfare of the child should be considered primarily in adoption proceedings, and in 1957 the legislature re-enacted paragraph 3—7 and further provided that a surrender of the child to a licensed child welfare agency for the purpose of adoption should also be irrevocable unless fraud or duress is shown. Ill.Rev.Stat.1957, chap. 4, par. 3—7. A child is not a chattel. It would be a repudiation of the public policy as declared by the legislature, and contrary to the best interests of the child, to hold, as the intervening petitioners urge, that the laggard putative father, by a marriage with the mother occurring at any time before the filing of a petition for adop-

tion, is vested with the right to control the adoption proceedings by either giving or refraining from giving his consent thereto. It must also be considered that the statute requires a delay of six months between the time when the child is taken to the home of the adoptive parents and the filing of a petition for adoption. During that period bonds of affection would undoubtedly have been forged between the adoptive parents and the child, and the breaking of such bonds might have a marked effect on the child both physical and psychological. It was to prevent such disturbances that the legislature made the consent of the parents to the adoption of the child irrevocable.

"In the instant case the mother gave up the custody of the child and consented to his adoption. The father did nothing. The mother's action was caused by the fact that she was pregnant with a second child by the putative father and he had refused to marry her. At that time a marriage ceremony between them could have resulted in the child remaining with them at their home. The belatedly expressed interest of the father in the child can have no effect. No question has been raised with reference to the form of the petition, and the consent of the licensed child welfare agency to the adoption was exhibited in court. The trial court properly found that Joseph Simonick, Sr. had no rights in the adoption proceeding then before the court."

In the case of In re Adoption of a Minor, Mass., 156 N.E.2d 801 (March 6, 1959), the Massachusetts Supreme Court had before it a situation where the natural parents of the child were married after the child's birth. The mother had consented in writing to the adoption. The court stated, loc. cit. 804:

" * * * Because the child became legitimate about eleven months before the final decree, we must decide whether that decree could be entered without the father's written consent, in view of G.L. c. 210, § 2, as amended (see footnote 2, supra). If the persons whose consent to the decree of adoption is required under § 2 are to be determined at the date of the decree, the consent of the natural father at that time may have become necessary. If the persons who must consent to the decree are to be determined at the date of the petition or upon the return of an order of notice under c. 210, § 4, then the result may be different. This question was first considered in this court for its possible bearing upon the Probate Court's jurisdiction to enter the decree. See Foster v. City of Everett, 334 Mass. 14, 16, 133 N.E. 2d 480; Witzgall v. Witzgall, 334 Mass. 365, 368, 136 N.E.2d 219.

* * * * * *

"It may be argued that G.L. c. 190, § 7, has no necessary relation to adoption proceedings because it appears in a chapter of the General Laws relating to descent and distribution and because the section is usually thought of only in that connection. See, e. g., 38 B.U.L.Rev. 299, 311–312. Section 7, however, has been applied in cases not involving the devolution of property. * * * There has been brought to our attention no indication whatsoever that the Legislature in framing the adoption provisions found in c. 210 has ever given any thought to the provisions of c. 190, § 7. We recognize, however, that § 7 carries out a broad legislative policy of relieving an illegitimate child, whose parents subsequently marry and whose father acknowledges him, from all the disabilities of birth out of wedlock and of placing the child on a parity

with legitimate children for all purposes. * * *"

At loc. cit. 806:

"We give great weight to the considerations mentioned in the testimony (quoted above) of the psychiatrist from the Children's Medical Center. See also Adoption of Morrison, 260 Wis. 50, 63–65, 49 N.W.2d 759, 51 N.W. 2d 713, which discusses this problem. When a child is placed by its parent for adoption in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. The interests of the natural parents in such a case must be completely subordinated to the paramount interest of the child. Weight must also be given to the general tendency in recent amendments (see footnote 4, supra) of the adoption statutes to permit a constantly greater area of discretion to the Probate Court with respect to approving adoptions which will serve the best interests of the child. In the absence of any indication that the Legislature has ever had G.L. c. 190, § 7, specifically in mind when dealing with c. 210, § 2, we hold that the consent of a father who was not a lawful parent at the child's birth or at the time when there is a default under c. 210, §§ 4 and 5, is not required by § 2, as a condition precedent to adoption."

The Supreme Court of Minnesota in 1951 decided the case of In re Adoption of Anderson, 235 Minn. 192, 50 N.W.2d 278. That was the case of a 17 year old unmarried mother having given birth to a daughter, and thereafter delivering the child to the County welfare board. She executed a written waiver and gave her consent for the child to be committed to the guardianship of the Lutheran Welfare Society. The father, before the child had been committed to its guardianship, appeared and admitted being the father, and then some nine months later married the mother. The Minnesota court stated that the issues with which they were concerned were, among others, 50 N.W.2d loc. cit. 282:

"In illegitimacy cases, is the consent of the mother alone, without that of the biological father, sufficient for a valid committal?"

The court reached the conclusion, 50 N.W. 2d loc. cit. 284:

"Parents who faithfully discharge their parental obligations with assiduity and to the full extent of their means and abilities are entitled to the custody of their children. Parental rights, however, are not absolute and are not to be unduly exalted and enforced to the detriment of the child's welfare and happiness. The right of parentage is not an absolute right of property, but is in the nature of a trust reposed in them, and is subject to their correlative duty to protect and care for the child. The law secures their parental right only so long as they shall promptly recognize and discharge their corresponding obligations. As the child owes allegiance to the government of the country of its birth, so it is entitled to the protection of that government, which as *parens patriae,* must consult its welfare, comfort, and interests in regulating its custody during its minority. Purinton v. Jam-

rock, 195 Mass. 187, 80 N.E. 802, 18 L.R.A.,N.S., 926.

"Clearly, where, with the consent of the mother, a child born out of wedlock has been committed to the guardianship of a child-placing agency for adoption, the consent of the guardian alone without any further consent of either natural parent, and without further notice to either of them, is sufficient as a basis for a subsequent valid adoption. * * *"

We have read the cases cited by the appellant but do not adopt them as our opinion. We do not think that the case of Gates v. Seibert, 157 Mo. 254, 57 S.W. 1065, is in point or helpful in resolving the question. Other cases cited by the appellant offer no assistance: In re Hickman, Mo.App., 170 S.W.2d 695 (decided before our present adoption statutes); Rochford v. Bailey, supra (consent of mother was not obtained before adoption proceedings); A. v. B., 217 Ark. 844, 233 S.W.2d 629; Ellis v. Woods, 214 Ga. 105, 103 S.E.2d 297.

Subsection 3 of Section 453.030 RSMo 1949, V.A.M.S., sets out the requirements of parents as to consent, as follows:

"3. With the exceptions specifically enumerated in subsections 1, 2, and 3 set forth in section 453.040, when the person sought to be adopted is under the age of twenty-one years, the written consent of the parents, or surviving parent, of such person, or of the mother alone of such person if such person was born out of wedlock, to the adoption shall be required and filed in and made a part of the files and record of the proceeding. Such written consent may be executed . prior to or subsequent to the institution of the adoption proceedings, and shall be acknowledged as conveyances of real estate are required to be acknowledged under the laws of this state, or in lieu of such acknowledgment, the signature of the person giving such written consent shall be witnessed by the signatures of at least two adult persons whose addresses shall be plainly written thereon."

The exceptions mentioned in Section 453.030 and specifically set out in Section 453.040 RSMo 1949, V.A.M.S., do not apply in this case. The statute fixes the requirements for the consent, and those requirements were met in the instant case. To hold otherwise would strip the adoption statutes of their effectiveness.

Absent fraud, duress, coercion, and other elements which might make the consent of the mother involuntary, for which a court in its sound discretion might permit the revocation of the consent, the rights of the parties are fixed at the time of the consent and the subsequent orders of the court having jurisdiction.

After a review of the case both as to the law and the evidence, and arriving at our own conclusion as to what disposition will be to the best interests of the child, we should, and do, give special regard to the fact that the trial court had an opportunity to see and hear the witnesses and to judge their credibility. The trial court's judgment shall not be set aside unless clearly erroneous. We do not find that the trial court's judgment was erroneous, or that the court abused its judicial discretion.

The trial court's order, judgment and decree should be affirmed. It is so ordered.

ANDERSON, Acting P. J., and RUDDY, J., concur.