[1] Reported in 27 N.W.2d 656.
This case comes before us upon petitioners' appeal from an order denying their alternative motion for amended findings or a new trial. We shall determine the issues only upon the second ground.
Petitioners sought to adopt Rosalind Ann, born in lawful wedlock to Leonard and Audrey Johnson March 14, 1937. Leonard, the child's father, died July 20, 1937, when Rosalind was only about four months old. Leonard was the brother of petitioner Janess Peterson, so that she is the child's aunt. The court directed personal service of its order for hearing on the petition on the child's mother and on Charles LeRoy Jaren, who is her stepfather and adoptive parent. Statutory notice was also required to be made upon the state director of social welfare. In accordance with statutory requirements and the court's order, service was duly and properly made. Mr. Jaren is the only one contesting the petition. We shall hereinafter refer to the parties as plaintiffs and defendant.
Defendant based his special appearance upon the ground that, *Page 563 
absent consent on his part as the adoptive parent, the court was without jurisdiction to grant adoption.
The trial court's findings are lucid and exhaustive, and we shall recite them in substance.
Plaintiffs are husband and wife and have resided at Alexandria in Douglas county since 1925. Both are in good health and are possessed of ample means properly to care and provide for Rosalind's education, sustenance, religious training, and home surroundings. The home life of plaintiffs and this child is congenial and happy. As to their fitness, the court found:
"* * * Their home life is a happy one and they are highly respected in the community in which they live. They have two daughters, by adoption, Shirley, born July 21st, 1939, and adopted by them five weeks later, and Karen, born June 15th, 1933, and adopted four weeks thereafter. They are good parents and have provided a fine home for their two children. They have done likewise for Rosalind Ann during the time that she has been in their custody. * * * and if the child were subject to adoption their home would be highly suited to her needs. Janess Peterson, as Rosalind's aunt, is naturally anxious to care for the child. She and her husband are deeply attached to Rosalind Ann and she loves them and now regards them as her parents."
The findings further disclose that as to defendant he, too, is a man of "substantial means but his moral conduct subsequent to his divorce from Audrey [the child's mother] has not conformed to the rule applied to Caesar's wife." His domestic troubles have been many and varied. Among these may be mentioned the fact that he has already been married three times. His first wife died; the next two secured divorces from him upon their respective suits for that purpose. His moral qualities are open to serious question. The charitable language employed by the trial court (quoted above) could well be amplified to his disadvantage. But the less said as to such matters the better. We are not disposed unnecessarily to air dirty linen for the morbidly curious to scoff at and deride. *Page 564 
Defendant and Audrey were married February 2, 1938. On April 26, 1940, a decree of adoption was duly issued upon defendant's petition to adopt Rosalind as his own child. By that decree, her name was changed from Johnson to Jaren. But marital troubles later arose, culminating on April 18, 1942, at the suit of Audrey, in a decree of absolute divorce being granted to her. The custody of Rosalind and Kathlee (the latter a child born to defendant and Audrey during their marriage) was given to defendant. However, shortly after their divorce, Audrey moved to Minneapolis, where she found employment. The evidence discloses and the trial court found that defendant and Audrey "continued to cohabit subsequent to their divorce, and neither evidenced sufficient fitness to act as custodian of Rosalind Ann." Defendant took both children to Audrey at Minneapolis, and she maintained them at her apartment. Since both children were hers, it seems but natural that she should assume this burden even though defendant had been granted their custody.
The matter of Rosalind's custody, however, soon became the subject of further judicial action. It was brought to a head by an episode which took place at Wadena, when during the early morning hours of Sunday, November 29, 1942, Audrey's sister, Mrs. Kopveiler, called up the Peterson home at Alexandria and asked them to come at once to Wadena, since Audrey was and had been on a drunken spree; that her condition was such as to make her wholly unfit to have charge of the children. Plaintiffs, pursuant to this call, immediately got into their car and drove to Wadena. They brought Rosalind back with them to Alexandria, and she has been with them ever since. Not only was Audrey addicted to the excessive use of intoxicating liquor, but her morals otherwise were reprehensible. Defendant's week-end visits to her and their intimate relations at her apartment obviously created an impossible situation. Plaintiffs brought this matter to the attention of Judge Anton Thompson, who had presided at the divorce trial. After a thorough hearing, Judge Thompson made findings and ordered the custody of Rosa. lind to plaintiffs until the further order of the court. Judgment in conformity therewith was entered May 8, 1943. In August of that *Page 565 
year, defendant made an attempt to regain the child's custody, but his application was voluntarily dismissed by him, obviously because the facts then brought forth were not of such character as to be of aid to his contentions.
Then, as now, defendant objected to the court's jurisdiction on the ground that plaintiffs were strangers to the divorce proceedings. Judge Thompson did not deem such objection well taken, saying:
"I am satisfied that when both the father and the mother, as in this case, the plaintiff and defendant have become unfit and unsuitable to have the custody of a minor child, that third parties can intervene in behalf of the best interest of the child, * * *."
Judge Thompson also said:
"That at the present time both plaintiff and defendant are found unsuitable to have the custody and control of their minor child, Rosalind Ann Jaren, and that for the present the custody and control of said minor child, Rosalind Ann Jaren, is awarded to Janess Peterson and her husband, Argyll Peterson, of Alexandria, Minnesota, until the further order of this Court, and without prejudice to the defendant to make application for a change of custody of said child from said Janess Peterson and Argyll Peterson at any time the defendant feels and can show to the Court that he is a competent and suitable person to have the custody of said child, * * *."
Rosalind's mother has duly consented to the adoption, as has also the director of social welfare, who did so after a most careful investigation of all relevant facts pursuant to Minn. St. 1945, § 259.02.[2] The trial court characterized the director's report and the facts therein recited to have been "made in conformity with the practice of that department, which is before this court and helpful in many respects." As a part thereof, we find this statement by Dr. G. W. Clifford:
"At the time Rosalind came to the Peterson home in 1942, she was nervous and apprehensive, under-developed with secondary anemia. She was underweight, had no appetite, was very difficult to control, *Page 566 
had a marked fear reaction, and was subject to periods of depression. The child has since developed into a healthy, robust, normal girl. The change is remarkable."
Consent to adoption is governed by Minn. St. 1945, § 259.03,[3]
which so far as here material provides:
"Except as herein provided no adoption of a minor shall be permitted without the consent of his parents, but the consent of a parent * * * who has lost custody of the child through divorce proceedings * * * may be dispensed with, and consent may be given * * * by the director of social welfare."
And the status of an adopted child is by § 259.07[4] thus defined:
"Upon adoption such child shall become the legal child of the persons adopting him and they shall become his legal parents with all the rights and duties between them of natural parents and legitimate child. By virtue of such adoption, he shall inherit from his adopting parents or their relatives the same as though he were the legitimate child of such parents and shall not owe his natural parents or their relatives any legal duty; and, in case of his death intestate, the adopting parents and their relatives shall inherit his estate as if they had been his parents and relatives in fact."
In the light of the facts and the statutory requirements herein recited, the trial court concluded "That the consent required by law has not been obtained," and "That the allegations of the petition [for adoption] have not been sustained by the evidence." These were the only reasons why the court concluded "that said proceedings be, and the same is hereby in all things dismissed."
1. Adoption has been defined as "an act by which relations of paternity and affiliation are recognized as legally existing between persons not so related by nature." 1 Am. Jur., Adoption of Children, § 2.
2. The origin and foundation of the right of adoption are well stated in Id. § 3, as follows: *Page 567 
"The right of adoption, while known to the ancients of Greece and Rome, and probably to other ancient peoples, and while practised among many of the continental nations under the civil law from the remotest antiquity, was unknown to the common law of England, and exists in this country in those jurisdictions having that law as the basis of their jurisprudence, only by virtue of statute. The beneficent public policy involved in such statutes has made of them an essential part of the jurisprudence of the United States."
3. In this state, legislative authority furnishes the basis for and provides the methods to be employed for accomplishing the act of adoption. In the determination of that problem, under our law and decisions generally, such "statutes are now generally regarded as intended to make a complete change in the common law. The prevailing tendency at the present time is in the direction of a liberal construction" of such acts to promote the legislative purpose. Id. §§ 4 and 6.
4. Important to bear in mind is that the public, as well as those immediately concerned, have vital interests in matters of this nature, since, obviously, it is a matter of immediate concern to all members of the state. It is no longer a private affair.
Stearns v. Allen, 183 Mass. 404, 67 N.E. 349,97 A.S.R. 441, a leading case on this phase, is both instructive and enlightening. There, the father of a child for whom adoption was sought was a resident of Scotland. The child was born in Massachusetts, and the adopting parents were residents of that commonwealth. Said the court (183 Mass. 408, 409, 67 N.E. 351,97 A.S.R. 441):
"Adoption involves a change of status. So far as the adopting parents are concerned, the change cannot be made without their consent. So far as an infant child is concerned, the State, as his protector, may make the change for him. The natural parents of the child should be considered and their natural rights should be carefully guarded, but their rights are subject to regulation by the State, and if these come into conflict with the paramount interests of the child, it is in the power of the State, by legislation, to separate *Page 568 
children from their parents when their interests and the welfare of the community require it. * * *
"In many of these cases the State may exercise and ought to exercise jurisdiction over the child. If the child is actually dwelling in the State, although his father's domicil is elsewhere, the State may as well provide for his adoption as to provide for him in other ways. * * * From the necessity of the case, inasmuch as it has not always been possible to find all the interested parties in the same State, it is enough to establish jurisdiction which is binding upon the natural parent if he is given reasonable notice of the pendency of the proceedings, and an opportunity to be heard. * * *
"In the case at bar the child, by virtue of her birth in Massachusetts, was a citizen of the United States and of Massachusetts, notwithstanding that her father was domiciled in Scotland. The fourteenth amendment to the Constitution of the United States provides that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.' * * * This provision alone would give Massachusetts jurisdiction to authorize proceedings for adoption, and our statute should be held to apply to such a case."
Especially helpful here is an article written by Judge Edward F. Waite of Minneapolis appearing in Minnesota Medicine, August 1932, Vol. XV, p. 509. We need not dwell upon Judge Waite's recognized ability, especially in the field of domestic relations. After reviewing the early history of the law relating to adoption of minor children, he expressed as particularly important the fact that the state board of control, by L. 1917, c. 222, had been granted broad powers in matters pertaining to children's welfare, particularly in situations where public interests were considered to be important. He commented upon our earlier laws which had not provided safeguards against "the mercenary and unsupervised baby-farm" and the evils flowing therefrom and said in this respect:
"* * * In the old days the mercenary keeper of a lying-in establishment or baby-farm was permitted to dispose of the child as *Page 569 
though it were a vagrant puppy, while Mother Minnesota stood idly by, seemingly heedless of the fate of the helpless little one."
And, he concluded, in respect to the "placement" of the child, that this should not be given to "private and unsupervised placements" because "the spirit and letter of the law * * * prescribes a different procedure, to be carried out through the state's officially responsible instrumentalities"; and that "the welfare of the child ought to be the matter of paramount concern, to which — in the event of conflict — every other interest must give way." See, 11 Minn. L.Rev., Jurisdictionaland Social Aspects of Adoption, p. 605; 22 Columbia L.Rev., The Law of Adoption, p. 332.
The determinative question here, as it was below, is whether defendant's refusal to consent to Rosalind's adoption by plaintiffs constitutes such a barrier as to prevent the accomplishment of her adoption by plaintiffs. The trial court was also of that view, since its conclusion was "That the consent required by law has not been obtained."
5. The jurisdiction of the district court as to the subject matter in hand, as well as that of those directly interested as parties, including the public interests represented by the director of social welfare, is not questioned. So also are the essential facts heretofore recited, Rosalind's father died when she was just an infant. The mother's consent and that of the director of social welfare have been duly obtained. The fitness of plaintiffs to adopt this child is not in doubt. They are eminently qualified to become the foster parents of this little girl. As to defendant's fitness, about all that can possibly be said for him is that he still is on probation, a matter of many years' duration. To wrest her from plaintiffs' custody, in view of the facts and circumstances related, requires cogent proof that the best interests of this child would not be seriously hampered or lessened thereby. For a period of four and one-half years and during the essentially formative period of her life she has been a happy member of plaintiffs' family. The undisputed facts as to home and other environments fully establish that Rosalind will be reared to splendid womanhood with plaintiffs and their adopted daughters, *Page 570 
all of them as members of the same family. No unbiased mind can read this record and arrive at any other conclusion. Defendant should bear in mind that it was his shortcomings that brought about his divorce from the child's mother. Rosalind's future and her best interests should reconcile him to the change of custody now sought. Plaintiffs have given, and will continue to give her as their daughter, their love and affection as fully and as faithfully as though they were her natural parents. Cf. Kurtz v. Christensen, 61 Utah 1, 209 P. 340.
Our cases fully sustain these views. Spratt v. Spratt,151 Minn. 458, 187 N.W. 227, illustrates what we have in mind. That case came before this court on several occasions. Our final decision was that our divorce statutes conferred upon the district court full power to revise and alter its orders concerning the care and custody of minor children whose parents had been divorced and to make such new orders as the circumstances of the parents and the benefit of the children might require. There, citing Arne v. Holland, 85 Minn. 401,89 N.W. 3, we said (151 Minn. 462, 187 N.W. 228):
"* * * that decrees of divorce are entered in pursuance of and are founded upon the statute, which affords a short and speedy remedy; that the ultimate question is, do the child's interests demand a modification of a former order; that the court is not limited to any particular line of inquiry or bound by strict legal rules of evidence, and its orders and directions are not subject to the tests usually applied to the trial of causes, and that the test to determine the validity of the court's order is, was there an abuse of discretion?"
Here, at the time of the original divorce trial, Judge Thompson was faced with a very serious problem, i. e., to which parent should the custody of the children be awarded. No other interested party was before him. Obviously, neither parent was an ideal one to have such custody. The mother's behavior had been such as virtually to leave her out of consideration. The father's past record has been, to say the least, a dubious one. Therefore, when the matter came before Judge Thompson anew, still having in mind his original order, he found it necessary to change the child's custody from that of defendant *Page 571 
to plaintiffs. At that time plaintiffs were not before the court as party litigants. Now, by virtue of this adoption proceeding, they are before the court seeking this child's custody.
In Novotny v. Novotny, 152 Minn. 420, 422, 189 N.W. 258,259, we said:
"The courts have always found it a difficult matter to harmonize the wishes of divorced parents with respect to their future relations toward their children. In a general way the problem is one to be solved by the trial courts. In solving it, they are invested with a broad discretion, this court being reluctant to interfere in the absence of a showing that there has been arbitrary action, or, as more commonly stated, an abuse of discretion."
In its broad aspects, we have here a similar situation. In the Novotny case, the issue was between the parents; here it is between an adoptive parent and those who now seek the child's custody under our law of adoption.
The adoption of Rosalind by plaintiffs appears to be the only satisfactory solution of her present and future welfare. The unreasonably withheld consent of defendant to her adoption is, under the evidence disclosed by this record, not a bar. His claimed right to her custody has resulted only in trouble and turmoil. The time has arrived to end this legal strife, which, as to defendant, is founded upon and is and has been no more than a mere paper custody. He utterly lacks fitness to act as her custodian. His probationary period of more than five years since the divorce was granted proves beyond any reasonable doubt that it should not be further extended. This child's future is too important to permit of further delay. We conclude, therefore, that the order here for review should be and it is hereby reversed, with instructions to the trial court to grant the adoption sought by plaintiffs. So ordered.
Reversed with directions.
[2] See, M.S.A. § 259.02, and cf. Mason St. 1927, § 8625.
[3] See, M.S.A. § 259.03, and cf. Mason St. 1927, § 8626.
[4] See, M.S.A. § 269.07, and cf. Mason St. 1927, § 8630. *Page 572