# IN RE TRUST CREATED BY LAST WILL AND TESTAMENT OF RICHARD STEEDMAN PATRICK.
# PHILIP KING PATRICK AND ANOTHER v. NORTHERN CITY NATIONAL BANK OF DULUTH AND OTHERS.

106 N. W. (2d) 888.

December 16, 1960—No. 38,010.

*Nye, Montague, Sullivan & McMillan,* for appellants.

*Butchard, Fredin & Eaton,* for respondents descendants of Lydia Woodbridge Jamar and Roger M. Woodbridge.

*James J. Courtney & Sons,* for respondents Jessie Norval and her children.

LOEVINGER, JUSTICE.

This case involves the question whether a putatively adopted son is a "descendant" within the meaning of a will.

Testator died a resident of Duluth, Minnesota, in 1949. His will, executed in 1940, left the residue of the estate to testator's wife, and upon her death in specified proportions to testator's stepdaughter and siblings, if then living, and, if not, to their respective "descendants."

Testator's brother, John Patrick, died in 1955, and testator's widow died in 1958. The trustee under the will thereafter instituted this proceeding to secure a determination of the persons then entitled to the benefits of the testamentary trust.

In 1915 John Patrick lived in Edinburgh, Scotland, when a newborn infant, Philip King, was placed in the care of Margaret Patrick, testator's mother, who also lived in Edinburgh. John Patrick had no children of his own and immediately took a personal interest in the infant boy. In 1917 John Patrick corresponded with the natural father of Philip King, writing: "I propose to you that I will adopt the child." In further correspondence, agreement was reached between the two men that the natural father should pay certain sums for the benefit of Philip and that John Patrick should adopt him. The natural father then wrote to John Patrick: "Of course Sonny is now your boy," to

which John Patrick replied that "Philip is now my child." Thereafter Philip was raised by John Patrick, was known as "Philip King Patrick," and was treated as the son of John Patrick by the members of the Patrick family. Testator referred to Philip as his "nephew" in both correspondence and conversation. However, there were no de jure or formal adoption proceedings involving John Patrick and Philip.

The district court found that John Patrick had assumed the custody, care, maintenance, and obligation of bringing up Philip King Patrick pursuant to an agreement with the child's natural father, had carried out said agreement, raised the child in his own home, and treated him as his own son until the time of his death. It found that there was no provision in *English* law for formal legal adoption when the agreement was entered into and carried out and that John Patrick did not formally adopt the child. The court found that testator at the time of making his will "knew of the circumstances" under which Philip King Patrick became a member of the John Patrick family, but that it was not the intention of testator that Philip King Patrick should take as a descendant of John Patrick. Philip King Patrick appeals from the order based on this finding. A proper disposition of this case requires consideration of applicable principles of law.

It has been said that in the construction of wills every testator is presumed to know the law.[1] This is an obvious legal fiction although it may express a practical working rule. It would be more accurate to say that the words of a will should be construed in accordance with precedents and statutes unless it is established by a preponderance of evidence that a testator intended some other meaning.

In this state adopted children stand in the same position as biological children in all respects, including their right to inherit by laws of intestacy or under appropriate testamentary provisions.[2] By such legal policy, the terms "children" and "issue" are presumed to include both

---

[1]In re Trust Under Will of Davidson, 223 Minn. 268, 273, 274, 26 N. W. (2d) 223, 226, 170 A. L. R. 215; 95 C. J. S., Wills, § 633, p. 901; 57 Am. Jur., Wills, § 1162.

[2]Minn. St. 259.29; In re Estate of Youmans, 218 Minn. 172, 15 N. W. (2d) 537, 154 A. L. R. 1171; In re Trust Under Will of Holden, 207 Minn. 211, 291 N. W. 104.

biological and adopted offspring.[3] Likewise, in the modern view, the term "descendants" prima facie includes adopted as well as biological offspring.[4]

This is not the general, or perhaps even the majority, view.[5] However, it is based upon humane and compassionate considerations which are appropriate to the attitudes of a modern civilized society, and which are expressed in our statutes on this subject. We have come to realize that it is not the biological act of begetting offspring—which is done even by animals without any family ties—but the emotional and spiritual experience of living together that creates a family. The family relationship is created far more by love, understanding, and mutual recognition of reciprocal duties and bonds, than by physical genesis.[6] The marriage ceremony gives recognition to this fact as between spouses. Formal adoption recognizes this fact as between parents and children.

With respect to a claimant's right to take from an estate being probated in this state, the status of the claimant is determined by the laws of his domicile, but his rights in the estate are determined by the laws of this state.[7] Thus, a child adopted in a jurisdiction wherein adoption does not confer rights of inheritance will, nevertheless, take

---

[3]In re Trust Under Will of Holden, 207 Minn. 211, 291 N. W. 104; Estate of Heard, 49 Cal. (2d) 514, 319 P. (2d) 637; Edmands v. Tice (Ky.) 324 S. W. (2d) 491; Bradford v. Johnson, 237 N. C. 572, 75 S. E. (2d) 632; Mooney v. Tolles, 111 Conn. 1, 149 A. 515, 70 A. L. R. 608, with Annotation at 621.

[4]In re Trust Under Will of Holden, 207 Minn. 211, 216, 291 N. W. 104, 107; In re Miner's Estate, 359 Mich. 579, 103 N. W. (2d) 498.

[5]Comer v. Comer, 195 Ga. 79, 23 S. E. (2d) 420, 144 A. L. R. 664, with Annotation at 670; In re Wehrhane's Estate, 23 N. J. 205, 128 A. (2d) 681; Will of Mitchell, 157 Wis. 327, 147 N. W. 332; Middletown Trust Co. v. Gaffey, 96 Conn. 61, 112 A. 689.

[6]See, Estate of Heard, 49 Cal. (2d) 514, 319 P. (2d) 637; In re Wehrhane's Estate, 23 N. J. 205, 212, 128 A. (2d) 681, 684 (dissenting opinion).

[7]Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455; In re Estate of Youmans, 218 Minn. 172, 15 N. W. (2d) 537, 154 A. L. R. 1171, with Annotation at 1179.

as an heir of his parent if the estate of the parent is disposed of in this state.[8]

As the district court found, there was no procedure for formal adoption in English common law.[9] Adoption was recognized and established under Roman law and civil law systems derived therefrom.[10] Adoption was made a part of the legal system of this country by statutes enacted in most of the states during the 19th century. The English law lagged behind in this respect, and it was not until 1926 that a statute provided for formal adoption in England.[11] Even then adopted children were not given rights of inheritance until 1949.[12] The principles of the English law on this subject have, until recently, been relatively primitive and inconsistent with enlightened and humane viewpoints and the public policy of this state.[13]

However, we must be cognizant that English law is not the law of Scotland.[14] Scotland was a country entirely separate from England

---

[8]In re Estate of Youmans, 218 Minn. 172, 15 N. W. (2d) 537, 154 A. L. R. 1171, with Annotation at 1179.

[9]In re Adoption of Jaren, 223 Minn. 561, 27 N. W. (2d) 656; Ross v. Ross, 129 Mass. 243, 37 Am. R. 321; 21 Halsbury's Laws of England (3 ed.) § 484.

[10]In re Adoption of Jaren, 223 Minn. 561, 27 N. W. (2d) 656; Ross v. Ross, 129 Mass. 243, 37 Am. R. 321; Encyclopedic Dictionary of Roman Law (1953) "Adoptio," p. 350; Mackenzie, Roman Law (6 ed.) part 1, c. VIII.

[11]Adoption of Children Act, 1926 (16 & 17 Geo. 5, c. 29); 21 Halsbury's Laws of England (3 ed.) § 485.

[12]Adoption of Children Act, 1949 (12, 13 & 14 Geo. 6, c. 98); 21 Halsbury's Laws of England (3 ed.) § 518; 17 Halsbury's Laws of England (2 ed.) § 1422.

[13]It should be noted that present English law embodies substantially the rule stated in the instant case: "In any disposition of real or personal property, whether testamentary or *inter vivos,* made after the date of an adoption order, any express or implied reference to children of the adopter includes the adopted person, unless a contrary intention appears; * * *." 21 Halsbury's Laws of England (3 ed.) § 518.

[14]Walker, *Some Characteristics of Scots Law,* 18 Modern L. Rev. 321 (July 1955); Kermack, Law of Scotland, p. 15 (1933); Burn-Murdoch, Notes on English Law as Differing from Scots Law, p. 1 (1924); Gibb,

until 1603, when there was a union of crowns by virtue of the succession of James VI of Scotland to the throne of England.[15] Scotland continued to have its own parliament until a constitutional union with England in 1707.[16] Although scholars disagree as to whether there was actually a "reception" of Roman law in Scotland, all authorities concur that Scots law is based on the Roman law and that Roman law has been a pervasive and powerful influence in shaping Scots law.[17] The laws of England and Scotland have tended to grow more similar since the constitutional union, but the countries still have separate legal systems with varying rules on different subjects—somewhat as the several states of the United States. On unsettled points in Scots law, the principles of Roman law are of more influence than those of English law.[18]

Prior to 1930, there was no statutory procedure for the adoption of children in Scotland.[19] However, both statute and judicial opinion have recognized the prior existence of a relationship of "de facto adoption."[20] This has also been characterized as "common law adop-

A Preface to Scots Law, p. 1 (1944); Walker, The Scottish Legal System, p. 66 (1959).

[15]Kermack, Law of Scotland, p. 12.

[16]Kermack, Law of Scotland, p. 12; 20 Ency. Britannica (14 ed.) p. 168.

[17]Wilson, *The Reception of the Roman Law in Scotland*, 9 Juridical Rev. 361 (1897); Kermack, Law of Scotland, p. 28 (1933); Fisher, *Scotland and the Roman Law*, 22 Tulane L. Rev. 13 (Oct. 1947); Walker, The Scottish Legal System, p. 129 (1959). Wigmore says that by 1600 Scots law was almost completely Romanized. 3 Wigmore, Panorama of the World's Legal Systems, p. 1014. It has also been said that Scots law is "perhaps more Romanised than any other system of law existing." See Note by R. C. Henderson in Kermack, Law of Scotland, p. 7. In Scottish statutes, "common law" means the civil law, or Roman law. 9 Ency. of the Laws of Scotland, §§ 27, 28.

[18]Cantiere San Rocco v. Clyde Shipbuilding & Engineering Co. 1923 Sess. Cas. (H. L.) 105, [1924] A. C. 226; authorities cited in footnotes 14 and 17, *supra*.

[19]Gibb, A Preface to Scots Law, p. 55 (1944); Adoption of Children (Scotland) Act, 1930 (20 & 21 Geo. 5, c. 37).

[20]Adoption of Children (Scotland) Act, 1930, § 10 (20 & 21 Geo. 5, c. 37); G, Petitioner, 1939 Sess. Cas. 782; K, Petitioner, Reports—1949, Scots Law Times 89.

tion" under Scots law.[21] As early as the 19th century, Scotch courts had recognized the right, in certain circumstances, of those who acquired custody of a child by agreement to retain it, and referred to such parents as having "adopted" the child.[22] In the light of all these considerations it appears that some sort of adoption was known to the law in Scotland at the time of the events involved here.

It is undisputed that John Patrick and Philip King Patrick were residents of Scotland and subject to its laws in 1917. The evidence is conclusive that John Patrick agreed with Philip's natural father to adopt Philip as his son, that John Patrick did in fact treat Philip as a son in every respect until death took John Patrick in 1955. Certainly this is a "de facto adoption" in every sense. As the law of Scotland recognized such a relationship, it is immaterial what its legal consequences in Scotland were, since for purposes of this case the rights deriving from the relationship are determined by the law of Minnesota.

Thus, it must be presumed that testator intended Philip King Patrick to be included within the term "descendant" unless there is a preponderance of evidence to the contrary. However, there is no evidence to the contrary. The evidence is conclusive that testator knew of the de facto adoption and regarded Philip King Patrick as his nephew. Such credible and relevant evidence as there is in the record supports an inference that testator understood the term "descendant" to include adopted children. There is no basis in the record for any contrary finding. It thus appears, and we hold, that testator intended Philip King Patrick to take under testator's will as a descendant of John Patrick.

This disposes of the issue on appeal. However, the order appealed from directed the disposition of the testamentary trust estate in a manner that will be affected by the conclusion stated herein. It is, therefore, necessary to remand this case to the court below for further proceedings.

The order appealed from is set aside, and the case is remanded for further proceedings in accordance with this opinion.

---

[21]Ency. of the Laws of Scotland, 1949 Supp. vol. 1, §§ 431A, 431B, 431C. Note that "common law" means civil, not English, law. Footnote 17, *supra.*

[22]Sutherland v. Taylor [1887] 15 R. 224, 25 Scottish L. Rep. 189.