In re ADOPTION OF T.A.M.
and E.J.M.

by J.M.J. and L.A.M. and J.M.J., n/k/a
J.J.T., petitioner, Appellant,

v.

L.A.M., Respondent,

Ramsey County Child Support,
Intervenor.

No. A10–736.

Court of Appeals of Minnesota.

Dec. 14, 2010.

Nathan M. Hansen, North St. Paul, MN, for appellant J.M.J.

Dana K. McKenzie, Suzanne M. Born, Assisted Reproduction & Adoption Law, PLLC, Golden Valley, MN, for respondent.

Considered and decided by JOHNSON, Chief Judge; MINGE, Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

The two legal issues in this same-sex adoption appeal arise from an evolving relationship between two women, two men, and two little girls. The women were involved in a lesbian relationship when one of them arranged to conceive a child with a male friend. They conceived twin girls whom they planned to be adopted by the woman's same-sex partner as the girls' "second parent." Soon after the birth and adoptions, the two women separated. The natural mother years later met and married a man and moved the district court to vacate the adoptions, contending that fraud infected the adoptions and that

Minnesota law does not authorize unmarried second-parent same-sex adoption. The district court deemed the legal argument to be both unfounded and untimely, so it dismissed the motion and severely sanctioned the natural mother and her attorney by ordering them to pay attorney fees. Because the natural mother's argument on appeal fails to challenge the district court's untimeliness basis for dismissing her motion, we affirm the dismissal on that basis only. And although the motion's legal proposition that Minnesota law does not authorize second-parent adoption by unmarried persons has arguable merit and cannot be a basis for a sanction, we nevertheless affirm the sanctions because the sanctions also rested on proper bases, including the unexcused tardiness of the natural mother's motion filed eight years after the adoptions.

## FACTS

J.M.J. and L.A.M. began a lesbian relationship in 1995 and later cohabited. In 2000, J.M.J. privately arranged with J.L., her former boyfriend, to conceive a child, with J.L. relinquishing his parental rights and having no parental obligations.

J.M.J. became pregnant as planned and gave birth to twin girls in July 2001. She was still living with L.A.M., who wanted to adopt the twins and serve as J.M.J.'s "co-parent." A month after the twins' birth, J.L. consented in writing to L.A.M.'s adoptions and to the termination of his parental rights as the natural father, and J.M.J. supportively signed L.A.M.'s adoption petitions.

At the September 2001 adoption hearing, J.M.J. expressly supported L.A.M.'s adoption of her daughters and stated that she understood its legal permanency:

Q. Do you understand that if your petition is approved that [L.A.M.] will be a legal parent of these children and that will continue even if you and [L.A.M.] do not continue to be in a domestic-partner relationship together?

A. Yes, I do.

. . . .

Q. So do you understand, if your relationship were to end, either one of you could petition for child custody and either one of you could petition for child support?

A. Yes, I do.

The district court granted the adoptions, terminating J.L.'s parental rights and conferring parental rights to L.A.M. without extinguishing J.M.J.'s parental rights.

J.M.J. and L.A.M.'s relationship ended very soon after the adoptions. The pair separated in 2002, and they began a still-continuing series of legal squabbles over custody, parenting time, and child support.

In the meantime, J.L., who is not a party to this dispute, maintained a relationship with the twins, even referring to them as "my children" in a recent affidavit. J.L. also affirmed that he had been the twins' daily childcare provider during their first year, participated in their birthday celebrations, maintained rooms for them in his house for sleepovers, and involved his own family in their lives. J.M.J. eventually married a man (not J.L.), who is also not a party to this dispute. J.M.J. moved to Arizona with her husband, but she maintained her home in Minnesota to spend her parenting time with the twins.

In April 2009, J.M.J. moved the district court to vacate L.A.M.'s adoptions. She maintained that Minnesota statutes do not authorize adoptions either by same-sex couples or by unmarried persons regardless of gender. She also maintained that the twins' adoptions had resulted from a material factual error and fraud, specifically regarding the method of their conception. The district court denied J.M.J.'s

motion challenging the adoptions' validity. It deemed J.M.J.'s motion to be untimely under the applicable procedural rules, and it also deemed J.M.J.'s statutory argument to be legally unfounded. It issued sanctions against J.M.J. and her attorney requiring them to pay L.A.M. about $9,500 in attorney fees for bringing the motion, which the district court deemed to be untimely and substantively unfounded.

This appeal follows.

## ISSUES

I. Did the district court properly deny J.M.J.'s motion to vacate L.A.M.'s adoptions?

II. Did the district court abuse its discretion by sanctioning J.M.J. and her attorney for bringing her motion to vacate L.A.M.'s adoptions?

## ANALYSIS

J.M.J. challenges the district court's denial of her motion to vacate the twins' adoptions and its order sanctioning her and her attorney for bringing the motion. We address both challenges.

## I

■ We first address J.M.J.'s appeal of the district court's denial of her motion to vacate, which was based in part on its determination that Minnesota law authorizes so-called "second-parent," same-sex adoptions. Both parties recognize that the issue is one of first impression but contend that Minnesota statutes plainly answer whether second-parent, same-sex adoption is allowed (J.M.J. insists that the statutes prohibit same-sex adoption and L.A.M. insists that the statutes authorize same-sex adoption). And both parties urge us to decide the appeal on that ultimate issue: the lawfulness or unlawfulness of second-parent, same-sex adoption. But because J.M.J. has failed to challenge the district court's procedural ground for rejecting her motion, we do not reach the substance of her challenge.

The district court rejected J.M.J.'s challenge to the validity of L.A.M.'s adoptions of J.M.J.'s twin daughters on multiple, independent grounds, including untimeliness. The district court held that J.M.J.'s motion was procedurally barred because J.M.J. failed to comply with rule 47.02 of the Minnesota Rules of Adoption Procedure, which establishes a 90–day post-adoption deadline for a party to move to void an adoption. It recognized that rule 47.02 was enacted after L.A.M.'s adoptions but noted that J.M.J.'s motion was also tardy under the longer, pre-existing general deadline of rule 60.02 of the Minnesota Rules of Civil Procedure. J.M.J.'s brief on appeal chiefly questions the district court's secondary conclusion that Minnesota law allows second-parent, same-sex adoption, but it completely ignores the district court's primary conclusion that J.M.J.'s motion does not survive the deadline imposed by the rules. Neither her statement of the case nor her briefing to this court even mentions the rules that the district court expressly applied to dispose of her motion.

■ That J.M.J. failed to challenge this independent, procedural basis of the district court's rejection of her motion to vacate L.A.M.'s adoptions is fatal to her appeal. Appellate courts generally decide only issues that have been argued on appeal. *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982). In some cases, we might apply our discretion to decide unchallenged matters *sua sponte,* but only if the prejudicial error is obvious or the interests of justice compel us to act. *Balder v. Haley,* 399 N.W.2d 77, 80 (Minn.1987). Those exceptions do not apply here.

■ The district court did not obviously misapply the deadline. We observe that the district court should not have relied on adoption rule 47.02 because the Rules of Adoption Procedure did not become effective until January 1, 2005—more than three years after the now-challenged adoptions. *See* Promulgation of Rules of Adoption Procedure, No. C1–01–927 (Minn. Sept. 30, 2004) (indicating that the rule applies "to all adoption matters commenced on or after the effective date"). But the district court alternatively concluded that J.M.J.'s motion was untimely under rule 60.02 of the Minnesota Rules of Civil Procedure. Adoption matters are civil in nature. *See* Minn.Stat. § 259.63 (2008) (stating that an appeal in an adoption matter may be taken "as in other civil cases"). Adoption rule 47.02 resembles civil procedural rule 60.02, which existed at the time of the adoptions and which provides that a party moving for relief from an allegedly void judgment must do so within a reasonable time. J.M.J. does not assert that rule 60.02 does not apply here and does not otherwise challenge the district court's application of the rule. And it is not otherwise apparent to us that the district court erred by deeming J.M.J.'s motion untimely.

We also identify no justice-related, discretion-invoking reason to put aside the district court's untimeliness determination that J.M.J. completely ignored in this appeal. J.M.J. commented on the unchallenged determination for the first time only after this court raised the matter by questioning her attorney about it during oral argument. The response suggested that J.M.J.'s failure on appeal to contest the district court's enforcement of the deadline should be excused simply because the legal issue that underlies her motion— the legality of second-parent, same-sex adoption in Minnesota—is both significant and uncertain. But our interests-of-justice concern focuses on whether the error itself creates an injustice to the party who failed to challenge it, not whether overlooking the alleged error facilitates our reaching some separate legal issue of broader importance. We are aware of no authority supporting the proposition that infusing a tardy motion with an important legal issue inoculates the motion from an otherwise dispositive procedural deadline.

We conclude that J.M.J.'s failure to contest the district court's holding that her motion was untimely under the Rules of Civil Procedure leaves the holding intact. The unchallenged holding was an independent ground for the district court's decision, and so, except as necessary for the discussion that follows, we have no occasion to address the district court's dictum that second-parent, same-sex adoption is lawful in Minnesota.

## II

■ We turn to J.M.J.'s challenge to the district court's $9,411.25 conduct-based attorney-fee sanction against her and her attorney. We review a district court's award of attorney fees for abuse of discretion. *Gully v. Gully*, 599 N.W.2d 814, 825 (Minn.1999). Among other ways, a district court abuses its discretion if it acts "against logic and the facts on record," *Putz v. Putz*, 645 N.W.2d 343, 347 (Minn. 2002), or if it enters fact findings that are unsupported by the record, or if it misapplies the law, *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn.1997). The parties' arguments here require us to decide whether the district court relied on improper factors when it sanctioned J.M.J. and her attorney.

■ The district court imposed the sanction based on rule 16.02 of the Minnesota Rules of Adoption Procedure. That rule, read in context with rule 16.01, subdi-

vision 3, permits the district court to sanction an attorney or a represented party, or both, if, among other grounds, the party's motion is not "well-grounded in fact" or not "warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." The rule mirrors rule 11 of the Rules of Civil Procedure and indicates that a court may issue the kind of sanctions allowed by rule 11. Treating rule 16 the same as rule 11, we will apply an objective, reasonableness test. *Uselman v. Uselman,* 464 N.W.2d 130, 142–43 (Minn.1990). So we do not focus on whether the arguing attorney personally believes his challenged argument is compelling, but whether "a competent attorney could form a reasonable belief" that it arises from the facts and law. *Id.* at 143. An argument does not justify sanctions simply because it fails or cannot survive a dispositive motion. *See Brown v. State,* 617 N.W.2d 421, 427 (Minn.App. 2000), *review denied* (Minn. Nov. 21, 2000). The aim is to penalize only the filing of clearly meritless claims, not the advancement of losing but arguably merited claims or theories.

The district court issued the sanction as conduct-based attorney fees against J.M.J. and her attorney, Wright Walling, on several grounds. Although the district court discussed its specific grounds for issuing the sanction, the interdependence of those grounds is not expressly stated, so we will discuss each separately on its own merits. The five grounds are these: (1) that J.M.J.'s argument that Minnesota law does not authorize unmarried, same-sex second-parent adoption is unfounded as a matter of law; (2) that J.M.J.'s attorney was personally "disingenuous" for making the argument on J.M.J.'s behalf; (3) that J.M.J. was obviously tardy in making the argument; (4) that J.M.J.'s claim that fraud occurred during the adoption proceeding is unfounded as a matter of fact; and (5) that

J.M.J. brought the motion with improper motives. Standing independently, some of these grounds are appropriate, some are not.

## Facial Legal Challenge to Unmarried Second–Parent Adoption

The district court cannot base the sanction on its determination that J.M.J.'s legal argument is unfounded in substance. The district court deemed "unfounded" J.M.J.'s argument that Minnesota law does not authorize second-parent, same-sex adoption. The district court seems to have concluded that the law indisputably allows the type of adoptions challenged here. It highlighted the statutory provisions that permit "any person" who has resided in Minnesota for at least one year to petition to adopt a child and that require only that the child's parents consent to the adoption, citing Minn.Stat. §§ 259.22 and 259.24 (2008). We agree with J.M.J. that these provisions do not themselves clearly render her argument facially unfounded.

Although reading those statutory provisions on their face might reasonably lead one to conclude that Minnesota law allows adoption by any number or arrangement of persons, that conclusion is not inevitable. It is true, as L.A.M. points out, that "any" is a comprehensive term and "person" might mean "persons." *See* Minn. Stat. §§ 645.08(1) (2008) (directing that words should be given their ordinary meaning); 645.08(2) (2008) (directing that the singular generally includes the plural in statutory construction). So the district court's interpretation has basic logical appeal. But so do other reasonable interpretations, like J.M.J.'s.

Rather than reading "any person" in isolation, for example, one might attempt to "give effect to all [the law's] provisions," Minn.Stat. § 645.16 (2008), and reasonably contend that in order to satisfy "[t]he ob-

ject of all interpretation and construction of laws ... to ascertain and effectuate the intention of the legislature," *id.*, "any person" is limited by the other provisions in the adoption law. And also, from the beginning of adoption by statute in Minnesota in 1876, those provisions have arguably always implied that any adoption that creates a two-parent relationship to the adopted child requires that those parents be married at the time of adoption. *See* Minn. Gen. Stat. ch. 124, § 26 (1878) ("[T]he prayer of such [adoption] petition, by a person having a husband or wife, shall not be granted unless the husband or wife joins therein."); Minn. Rev. Laws ch. 73, § 3612 (1905) ("If the petitioner be married, the spouse shall join in the petition."); Minn.Stat. § 259.21, subd. 7 (1953) ("'Petitioner' means a person and his spouse, if there be one, petitioning for the adoption of any person."); Minn.Stat. § 259.29 (1953) (excepting only stepparent adoption by the married spouse of the child's parent from rule that every adoption automatically extinguishes all preexisting parental relationships between the natural parents and adopted child). Because one might rationally contend that the express married two-parent adoption arrangements are implicitly exclusive, J.M.J.'s underlying legal position is not frivolous and cannot be the basis for the sanction here.

■ L.A.M. urges that all "second-parent adoptions" are essentially "step-parent adoptions" under the statute regardless of whether the "second parent" is bound to the first parent by marriage. But that interpretation is not indisputable. And we have cautioned, "[i]n deterring frivolous claims, we must be careful not to deter colorable claims for changes in the law or to impede further evolution of existing precedent." *Leonard v. Nw. Airlines, Inc.*, 605 N.W.2d 425, 433 (Minn.App.2000).

Here, as the parties acknowledge, there is no binding precedent on point. And allowing the development or clarification of law is particularly important concerning a legal claim like J.M.J.'s, which involves a matter of obvious social significance. "Important to bear in mind is that the public, as well as those immediately concerned, have vital interests in matters of this nature, since, obviously, it is a matter of immediate concern to all members of the state. [Adoption] is no longer a private affair." *In re Jaren's Adoption*, 223 Minn. 561, 567, 27 N.W.2d 656, 660 (1947). Sanctions naturally have a chilling effect and should be applied carefully to avoid implicitly discouraging legitimate argument on unresolved and debatable issues of law.

We are offering no interpretation defining the scope of lawful adoption or how competing arguments might be developed or decided on the merits. We hold only that J.M.J.'s argument to the district court that Minnesota's statutory scheme does not contemplate L.A.M.'s adoptions is sufficiently reasonable to avoid being even partially the source of judicial penalty.

### *"Disingenuous" Attorney*

■ We also cannot affirm the district court's stated rationale for its decision to punish J.M.J.'s attorney for his making the argument questioning the legality of unmarried second-parent, same-sex adoption on J.M.J.'s behalf. The district court dubbed J.M.J.'s attorney "disingenuous" for making the argument because the court learned that the attorney's law firm had previously posted a website advertisement discussing adoption services for unmarried and same-sex couples. In consequently holding that the attorney made the argument in "bad faith," the district court implicitly reasoned that the advertisement established that the attorney did not genuinely believe in his client's legal position

about the unlawfulness of same-sex adoption and that this warranted a sanction.

We have two problems with that approach. First, it addresses the attorney's subjective belief about the merits of his legal argument, not the objective reasonableness of the argument. As discussed, sanctions are reserved for arguments that lack objective merit without regard to personal doubts they might stir in their advocates. *See Uselman,* 464 N.W.2d at 143. An attorney's personal doubts about or disagreement with the merits of an argument that the attorney has advanced does not subject the attorney to monetary sanctions under rule 16.02 of the Rules of Adoption Procedure.

Second, even if an attorney's subjective impression about the quality of his argument were relevant, this case finds no link between the attorney's advertisement and the district court's censure. The website announced only that because the "rules" about "traditional families" have "lessened in recent years, adoptions may now be an option" for "unmarried couples and same-sex ... couples." Soliciting potential clients who seek a type of adoption that "*may* now be an option" does not itself render "disingenuous" the attorney's arguing later on behalf of some other client that the option actually is not authorized by law; the option can be *both* a developing practice *and* unsupported by law. Straddling the two ideas might be uncomfortable, but it is not impossible because they are not necessarily inconsistent. And although "[t]he Rules of Professional Conduct serve a different purpose than [procedural rule-based] civil litigation penalties," *In re Panel Case No. 17289,* 669 N.W.2d 898, 905 (Minn.2003), it is also instructive that attorneys may, without violating their duty to the court or to their clients, advocate on one client's behalf a position that

might create unfavorable precedent for a different client:

> Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest.

Minn. R. Prof. Conduct 1.7 cmt. 24.

We have searched but find no support in the record for the conclusion that J.M.J.'s attorney was disingenuous in making the argument, and so we deem the finding to be clearly erroneous. And whether or not the attorney personally doubted the argument, his making the argument does not support the sanction.

### Extreme Tardiness of the Argument

█ The district court's order indicates that it was also concerned with the argument's tardiness: "Petitioner had a right to challenge the legality of the adoptions within the time frame provided by statute and rule." This statement accurately implies the real fallacy in J.M.J.'s motion, and if it stood alone, it would indicate that the district court based its sanction *exclusively* on the tardiness of J.M.J.'s argument rather than on its perceived weakness. But the district court's reasons for its rebuke of the allegedly "disingenuous" attorney for making the argument forecloses that interpretation. The statement nevertheless convinces us that tardiness was an independent ground for the district court's sanction.

And the ground is sufficient in this case. We have previously upheld a district court's rule 11 sanction in favor of a defendant who was served with a defamation lawsuit two days after the deadline imposed by the statute of limitations. *Cole v. Star Tribune,* 581 N.W.2d 364, 370 (Minn.

App.1998). Because the defendant "spent thousands of dollars defending a frivolous action," we deemed issuing the monetary sanction to be within the district court's discretion. *Id.* The applicable procedural rule here had made it objectively apparent that J.M.J. would likely be barred from bringing her motion to void the adoptions at such a late date. And what is most significant to us is that J.M.J. not only brought her motion years after the latest conceivable deadline (and, as the district court carefully pointed out, eight years into the substantial parent-child relationship between the twins and L.A.M.), she also failed to argue to the district court that any justification, excuse, or reasonable interpretation of the rule should avoid the effect of its deadline. As best we can tell from the district court record, J.M.J. simply ignored the rule in her written submissions, just as she did in this appeal. In doing so, her extremely untimely motion was indeed unfounded on the facts and frivolous, despite its arguable substantive merit otherwise.

### Claim of Fraud during Adoption Proceeding

We also have found sufficient support for another basis on which the district court imposed sanctions against J.M.J. and her attorney. The district court appropriately determined that J.M.J.'s fraud theory was so devoid of any factual or legal support that sanctions were fitting. J.M.J.'s motion maintained that L.A.M.'s adoptions were invalid in part because the adoptions had been secured by fraud. The alleged fraud was the supposed false representation to the adoption court about the method of J.M.J.'s insemination. According to J.M.J.'s motion to void the adoptions, the adoption court had been fraudulently misled into believing that the children were conceived through artificial insemination while, in truth revealed by J.M.J. eight years after the adoptions, they were actually conceived through sexual intercourse. For at least three reasons we agree with the district court that J.M.J.'s fraud argument was sanctionably meritless.

First, whether the twins' conception resulted from artificial or natural insemination is irrelevant to the adoptions; the father was known and he participated in the adoption proceeding, expressly consenting to the automatic termination of his parental rights upon adoption by L.A.M. Second, even if the method of the twins' conception had been relevant in the adoption proceeding, the only place in the record the term "alternative insemination" is uttered is in the same sentence that says "the identity of the donor is unknown." Since the adoption documents named J.L. as the natural father, it is clear to us that this misstatement was never relied on by the district court. And third, even if falsely informing the adoption court about the conception method constituted a fraud on the court, the now-revealed fraud was J.M.J.'s alone because she was the only witness who was certainly present at conception. According to J.M.J.'s odd reasoning, J.M.J. misled the adoption court with the fraud from which she then sought judicial relief in the form of adoption invalidation. This part of J.M.J.'s motion was purely frivolous, being altogether factually, logically, *and* legally meritless. The district court acted well within its discretion by awarding L.A.M. attorney fees to compensate her for her cost spent unnecessarily responding to it.

### Improper Motives Behind Motion

We are not persuaded by the final basis of the district court's sanctions, which is its qualified finding that J.M.J. "appears" to have brought her motion to vacate the adoption "for improper motives and purpose." Adoption procedural rule

16.01 prohibits bringing motions for an improper purpose, "such as to harass or cause unnecessary delay or needless increase in the cost of litigation," and rule 16.02 authorizes sanctions for it. The district court found that J.M.J.'s inappropriate motive was "to gain an advantage" in the related family court ongoing parenting-time dispute she was having with L.A.M. and to embody her "intense dislike" of L.A.M. But forwarding an arguably meritorious legal argument in one proceeding with the hope of gaining some consequential advantage in a collateral proceeding is neither uncommon nor inappropriate in litigation. And although J.M.J. might intensely dislike L.A.M., intense dislike is not one of the motives sanctionable under rule 16.02. The rule authorizes district courts to sanction a party who engages in litigation for legally inappropriate reasons, such as harassment, procedural delay, or unnecessary cost generation. We have discerned from the record clear support for the district court's frustration with the ongoing and apparently acrimonious litigation between J.M.J. and L.A.M. But we do not interpret its order as indicating that it found that J.M.J. acted on any of the sanctionable bases allowed by rule 16.01.

## DECISION

We affirm the denial of J.M.J.'s motion to vacate L.A.M.'s adoptions on the district court's unchallenged rule-based determination that J.M.J.'s motion was fatally late, and we therefore do not reach the issue of whether Minnesota law authorizes unmarried second-parent, same-sex adoption. We affirm the district court's order for sanctions against J.M.J. and her attorney despite the order's including several insufficient grounds; J.M.J. brought her adoption-invalidation motion eight years after the adoptions ignoring the procedural deadline and contesting the adoption partly on an obviously baseless claim of fraud.

**Affirmed.**

MINGE, Judge (concurring specially).

I respectfully concur in the holdings and the decision. I do not join in the opinion.